**Case No. 23-3242**

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT
_____

HEIDI REAMS,

Plaintiff-Appellant,

v.

INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 18

Defendant-Appellee.
_____

On Appeal From The United States District Court for the Northern District of Ohio
Case No. 3:21-cv-878, Judge James R. Knepp II

**BRIEF FOR APPELLANT HEIDI REAMS**

*/s/ Fred M. Bean*
_____
Fred M. Bean (0086756)
**THE SPITZ LAW FIRM, LLC**
25825 Science Park Drive, Ste., 200
Beachwood, OH  44122
Phone:   (216) 291-4744
Fax:       (216) 291-5744
Email: fred.bean@spitzlawfirm.com

*Attorney for Appellant Heidi Reams*

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ...........................................................iv

**STATEMENT IN SUPPORT OF ORAL ARGUMENT** .........................................vii

**STATEMENT OF JURISDICTION** ........................................................... 1

**STATEMENT OF ISSUES** ................................................................. 1

**STATEMENT OF THE CASE** .............................................................. 2

**SUMMARY OF ARGUMENT** ............................................................. 10

**ARGUMENT** ......................................................................... 15

**I.    STANDARD OF REVIEW** .......................................................... 15

**II.    THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT AS TO REAMS' DISABILITY DISCRIMINATION CLAIMS** ....................................................................... 16

**A. Reams' Federal And State Disability Discrimination Claims Can Be Analyzed Together** ............................................................ 16

**B. Reams Has Met Her Prima Facie Case** ............................................ 16

**C. There is Evidence Of Pretext Supporting Reams' Claims** ...................... 23

1. *The Law* ................................................................... 23

2. *There Is A Question Of Fact That Appellee's Allegations Did Not Actually Motivate Reams' Termination, Or Were Otherwise Insufficient To Warrant Termination* ........................................ 26

3. *Appellee Cannot Hide Behind The Honest Belief Rule* ..................... 39

**CONCLUSION** ....................................................................... 42

**CERTIFICATE OF COMPLIANCE** ......................................................... 43

**CERTIFICATE OF SERVICE** ....................................................................43

**ADDENDUM: DESIGNATION OF DOCUMENTS** .............................................44

# <u>TABLE OF AUTHORITIES</u>

<span style="font-variant: small-caps;"><u>CASES</u></span>

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505 (1986) .................. 16

*Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308 (6th Cir. 2019) ............. 37-38

*Bloomfield v. Whirlpool Corp.*, 984 F.Supp.2d 771 (N.D. Ohio 2013) ....... 22, 40-41

*Brenneman v. MedCentral Health Sys.*, 366 F.3d 412 (6th Cir. 2004) ................... 16

*Cannon v. Univ. of Tennessee*, 2017 WL 2189565 (E.D. Tenn.) ................ 25 (fn. 3)

*Cantrell v. Nissan N. Am. Inc.*, 145 Fed.Appx. 99 (6th Cir. 2005) ............. 25 (fn. 3)

*Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548 (1986) .............................. 34

*Chaniott v. DCI Donor Services, Inc.,* 481 F.Supp.3d 712 (M.D. Tenn. 2020) ................................................................................................. 22

*Columbus Civil Service Commission v. McGlone*, 82 Ohio St.3d 569, 1998 Ohio 410, 697 N.E.2d 204 ........................................................................ 17

*Dews v. A.B. Dick Co.*, 231 F.3d 1016 (6th Cir. 2000) ............................ 1, 12. 15, 25

*DiCarlo v. Potter*, 358 F.3d 408 (6th Cir. 2004) ..................................................... 26

*Hall v. Spencer County, Ky.*, 583 F.3d 930 (6th Cir. 2009) .................................... 16

*Hood v. Diamond Products, Inc.*, 74 Ohio St.3d 298, 1996 Ohio 259, 658 N.E.2d 738 ......................................................................... 10-11, 17, 20

*Lowe v. City of Monrovia*, 775 F.2d 998 (9th Cir. 1985) ............................ 24 (fn. 2)

*M.L. v. Williamson County Board of Education*, 772 Fed.Appx. 287 (6th Cir. 2019) ................................................................................................. 25

*Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078 (6th Cir. 1994) ......... 13, 26

*McGriff v. Beavercreek City School District*, 2021 WL 2401921 (S.D. Ohio) ................................................................................................ 20-21

*Merriweather v. Zamora*, 569 F.3d 307 (6th Cir. 2009).................................... 15-16

*Meyers v. Goodrich Corporation*, 2011 Ohio 3261 (8th Dist.) ................................26

*Mickey v. Zeidler Tool and Die Company*. 516 F.3d 516 (6th Cir. 2008) .................26

*Morrissey v. Laurel Health Care Co.*, 946 F.3d 292 (6th Cir. 2019) .....................20

*Mullenix v. Eastman Chemical Company*, 237 F.Supp.3d 695 (E.D. Tenn. 2017) ........................................................................................................22

*Nelson v. Univ. of Cincinnati*, 2017-Ohio-514 (10th Dist.)......................................26

*Nguyen v. Cleveland*, 229 F.3d 559 (6th Cir. 2000) .................................................26

*Phillips v. Roane County, Tenn.*, 534 F.3d 531 (6th Cir. 2008) ..............................15

*Plumbers & Steamfitters Joint Apprenticeship Commt. v. Ohio Civ. Rights Comm.*, 66 Ohio St.2d 192, 421 N.E.2d 128 (1981) ..........................................24

*Pollitt v. Roadway Express, Inc.*, 228 F.Supp.2d 854 (S.D. Ohio 2002)...........13, 25

*Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) ................................................................................ 25-26

*Singfield v. Akron Metro. Hous. Authority*, 389 F.3d 555 (6th Cir. 2004) .........13, 24

*Smith v. Chrysler Corp.*, 155 F.3d 799 (6th Cir. 1998) ...........................................40

*United States v. Stein*, 881 F.3d 853 (11th Cir. 2018) .................................31 (fn. 4)

*United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 103 S. Ct. 1478, 75 L. Ed. 2d 403 (1983) ................................................................24

*Valentin v. 1245, LLC*, 2023 WL 3318390 (11th Cir.).................................31 (fn. 4)

*Watkins v. Shriners Hospitals for Children, Inc.*, 2020 WL 2309468 (E.D. KY)..........................................................................................................22

*Wheeler v. McKinley Enters.,* 937 F.2d 1158 (6th Cir. 1991) .....................................1

*Williams v. Holt,* 2006 U.S. Dist. LEXIS 55148 (E.D. Tenn.).................................34

*Williams v. Time Warner Cable*, 1998 Ohio App. LEXIS 2793, No. 18663
   (9th Dist.) ............................................................................................................25

## STATUTES AND REGULATIONS

28 U.S.C. § 1291 ...........................................................................................................1

28 U.S.C. § 1331 ...........................................................................................................1

28 U.S.C. § 1367 ...........................................................................................................1

29 C.F.R. § 1630.2 ..........................................................................12, 18-19, 21-23

42 U.S.C. § 12101, *et seq.*..............................................................1, 11, 16, 19

O.R.C. Chapter 4112, *et seq.* .................................................................1, 11, 16. 18

vi

## <u>STATEMENT IN SUPPORT OF ORAL ARGUMENT</u>

Appellant requests an oral argument in this matter. The issues presented can be more fully explored if the parties are allowed the opportunity to present an oral argument to supplement the Briefs being submitted. As the Court can discern from Appellant's Brief, there are several issues up for review, necessitating not only lengthy briefing, but also oral argument before this Court so each issue may be properly addressed.

## STATEMENT OF JURISDICTION

The district court has jurisdiction pursuant to 28 U.S.C. § 1331, federal question (42 U.S.C. § 12101, *et seq*. (ADAAA), and supplemental jurisdiction pursuant to 28 U.S.C. § 1367, over Ohio claims relating to discrimination, O.R.C. Chapter 4112, *et seq*. Appellant Heidi Reams filed her Complaint against Appellee on April 27, 2021. Appellee filed a Motion for Summary Judgment, which was granted by the district court on February 23, 2023 as a final appealable order. Opinion, RE 30, PageID #1946-1970. Reams timely appealed on March 21, 2023. Notice of Appeal, RE 32, PageID #1972. Appellee did not file a cross-appeal. This Court has jurisdiction pursuant to 28 U.S.C. § 1291 over this appeal.

## STATEMENT OF ISSUES

1. Pretext is very rarely an issue for summary judgment. *Wheeler v. McKinley Enters.,* 937 F.2d 1158, 1162 (6th Cir. 1991). Moreover, summary judgment must be denied when there is a question of fact whether the purported reason(s) for termination "has no basis in fact." *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000). Here, Reams, at the very least, presented evidence calling into doubt or question the asserted reasons for her termination, including and specifically, whether her conduct, even if true, actually motivated the decision to terminate her employment. Did the district court err in weighing this evidence in favor of Appellee and granting summary judgment despite these questions of fact?

2. Summary judgment must be denied when there is a question of fact whether the purported reason(s) for termination "did not actually motivate the defendant's challenged conduct." *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000). Here, Reams presented evidence that Appellee treated her vastly different after suffering her disability and going on medical leave for an alleged performance error in contrast to how prior mistakes or errors were handled previously during her career. Moreover, Reams presented evidence that the alleged errors, prior to

her termination, were not investigation and/or rectified by Appellee, thereby raising a question of fact whether Appellee was actually motivated to terminate Reams for that reason. Did the district court err in weighing the evidence in favor of Appellee and granting summary judgment on the issue of pretext?

## STATEMENT OF THE CASE

### A. Introduction

Plaintiff-Appellant Heidi Reams worked as a full-time employee of Defendant-Appellee International Union of Operating Engineers, Local 18 ("Appellee") from April 2016 until her termination on August 20, 2020. In that nearly four-and-a-half year period, Reams was never a union member, nor subject to any terms in the Collective Bargaining Agreement, rather, she was merely a clerical worker directly employed by Appellee. Moreover, during her employment, Reams never received a single disciplinary action or warning, not for a performance-related issue, nothing. That fact is <u>undisputed</u> in this case. Instead, the record demonstrates that Reams worked from April 2016 through the end of July 2020, but then suffered a significant, life-threatening injury on July 26, 2020, when she tore her Carotid Artery during a chiropractor visit. As a result, Reams had to miss two weeks of work while in the hospital and on medical leave. Then, Reams returned to work on August 19, 2020. A day later, on August 20, 2020, Appellee terminated her employment.

### B. Summary Of Pertinent Facts

In January 2016, Defendant hired Reams as a clerk at its District 2 Toledo branch. Reams Declaration, RE 27-1, PageID #1158. Reams was initially hired through

2

a temp-to-hire service, serving as a temporary employee for the first few months of her employment. Reams Declaration, RE 27-1, PageID #1158. Then, around April 27, 2016, Appellee hired Reams as a full-time employee, working as a clerk in the District 2 branch. Reams Declaration, RE 27-1, PageID #1158. During the course of her employment, Reams worked alongside Kim Roberts, who served as the dispatcher in the District 2 office. Roberts Deposition, RE 26-7, PageID #571. LaFaso served as Reams' direct supervisor over the course of her employment. LaFaso Deposition, RE 29-8, PageID #1778.

As the District 2 clerk, Reams' duties included handling various financial-related transactions for union members. Reams Declaration, RE 27-1, PageID #1158. This included transactions related to union members paying dues and other fees related to their membership, using petty cash to purchase items as necessary to perform her duties, maintaining a cash sheet that would track financial transactions throughout the course of the week, and selling inventory (clothing, etc.) to union members. Reams Declaration, RE 27-1, PageID #1158. One of the chief problems that often led to an error on a dues letter to a member or a related document was the fact that members often paid dues for a period beyond what was owed. Reams Declaration, RE 27-1, PageID #1158. For example, part of Reams' job was to send out letters to members instructing them how much they owed in dues for the quarter or other applicable period. Reams Declaration, RE 27-1, PageID #1158. However, some members would then

3

come to the District office and actually give money to Reams, not only for the dues period owed, but for the next period as well. Reams Declaration, RE 27-1, PageID #1158. If this was done, Reams would have to reflect that changed amount on the documentation, often by crossing out the original amount and writing in a new one. Reams Declaration, RE 27-1, PageID #1158. Like her predecessor Roberts, Reams had instances where she had to be contacted by the Cleveland office regarding an error on a document that Reams would need to fix or an issue with a cash sheet that had to be balanced. Reams Declaration, RE 27-1, PageID #1158. Also like Roberts, Reams was never disciplined a single time, in over three years of employment with Appellee, for any alleged error. Reams Declaration, RE 27-1, PageID #1158. Indeed, Allen, who had the power to issue employee discipline, including written warnings, never disciplined or even sought to discipline Reams for any reason during her employment. Allen Deposition, RE 26-8, PageID #604, 610. The same goes for Roberts, who never sought nor discussed any disciplinary action for Reams during the entirety of her employment. Roberts Deposition, RE 26-7, PageID #573, 579.

Similarly, LaFaso, who directly supervised Reams for her entire employment, admitted to never disciplining Reams for any reason, including any alleged performance issues. LaFaso Deposition, RE 29-8, PageID #1797, 1799. Finally, LaFaso's supervisor, Richard Dalton, who served as Appellee's Business Manager at the time, similarly was not aware of one documented instance of Reams ever being

disciplined during her employment. Dalton Deposition, RE 27-3, PageID #1211, 1213. Indeed, not only was Reams never disciplined during her employment, she also received pay raises, including a two-year increase in April 2018, as well as another pay raise in December 2018. Reams Declaration, RE 27-1, PageID #1158.

On Friday, July 26, 2019, Reams was at the District office performing her duties per usual. Reams Declaration, RE 27-1, PageID #1159. Typically, Reams and Roberts would end every day by doing their dual-audits of the cash sheet and other transactions for the day. Reams Declaration, RE 27-1, PageID #1159. However, on July 26, Reams had a pre-scheduled appointment to see a chiropractor and therefore, had to leave early that day, around the time she and Roberts would normally complete their end-of-the-day audit. Reams Declaration, RE 27-1, PageID #1159. Roberts knew that Reams was leaving for her appointment and understood that the two of them would do the Friday audit on Monday morning when they both returned to the office. Roberts Deposition, RE 26-7, PageID #582. However, prior to Reams leaving on Friday, she had completed her own count of the money and discovered that there was a discrepancy on the cash sheet. Reams Declaration, RE 27-1, PageID #1159. Reams then **told Roberts about this discrepancy** and informed her that on Monday, the two of them would have to look at the documentation and fix the issue. Roberts Deposition, RE 26-7, PageID #582. Unfortunately, Monday never came for Reams in the traditional sense because while at her chiropractor appointment on July 26, during a "head-snap" procedure, Reams

5

suffered a severe laceration to her carotid artery in her neck. Reams Deposition, RE 29-1, PageID #1380. Reams suffered immediate pain from the injury and was later admitted to the emergency room that weekend with a 70 percent blockage of the blood flow through her artery, putting her at risk for a TIA (mini-stroke). Reams Deposition, RE 29-1, PageID #1380.

Once admitted to the ER on Sunday morning, July 28, Reams reached out to Appellee to inform them of her medical situation. Reams Declaration, RE 27-1, PageID #1160. LaFaso also learned about Reams' condition that weekend, including that she was in the hospital and had "torn a blood vessel or artery." LaFaso Deposition, RE 29-8, PageID #1780. Finally, Dalton likewise learned that weekend about Reams' condition after getting a call from LaFaso who informed him that Reams was in the hospital from an incident with a "chiropractor" that "caused her to black out" after a "neck snap" procedure. Dalton Deposition, RE 27-3, PageID #1216.

On Monday, July 29, 2019, the day after Appellee's representatives learned about Reams' condition and hospital admission, Roberts reported to LaFaso that there were "errors" in Reams' documentation, related to an overage in cash. Roberts Deposition, RE 26-7, PageID #581-582. This was the same overage that Reams had already told Roberts about on Friday before she left for her chiropractor appointment, so Roberts knew this discrepancy in the cash sheet exists—because Reams already told her about it. Roberts Deposition, RE 26-7, PageID #582. The plan was for Reams and

Roberts to re-balance the sheet on Monday during their normal dual-audit process, but since Reams was in the hospital, Roberts instead reported this information to LaFaso. Roberts Deposition, RE 26-7, PageID #582. Thereafter, LaFaso and Roberts reported this information to Dalton. LaFaso Deposition, RE 29-8, PageID # 1781. LaFaso admitted that the reporting of these alleged issues related to Reams occurred **after** gaining knowledge about her medical condition and hospital admission. LaFaso Deposition, RE 29-8, PageID # 1781.

Thereafter, on or around August 5, 2019, upon being discharged from the hospital, Reams presented a letter from her physician, Dr. Pillai, to Allen and Appellee, updating them about her medical status. Reams Declaration, RE 27-1, PageID #1160; Allen Deposition @ Exhibit 1, RE 27-5, PageID #1286. The letter indicated that Reams had been seen for a follow-up visit on August 5, 2019, had to remain out of work until August 19, 2019, and that she had previously been admitted for a "right artery dissection with 70% obstruction." Allen Deposition @ Exhibit 1, RE 27-5, PageID #1286.

Immediately upon her return to work on August 19, 2019, Reams was directed to meet with LaFaso and Michael Bertolone, a designated Special Representative for Appellee. LaFaso Deposition, RE 29-8, PageID #1784. By this point, Appellee was now accusing Reams of three alleged problems: (1) that the cash sheet reflected an overage of $140 (not $300), related to the possible overpayment of dues by a member;

(2) that $42.57 was missing from the petty cash supply; and (3) that the PEP inventory was off by one item. Allen Deposition @ Exhibit 3, RE 27-5, PageID #1287-1288.

In the meeting on August 19, Reams was asked about each of these issues. Reams Declaration, RE 27-1, PageID #1160. As to the dues overage, Reams recalled (after looking at her receipts and documentation) and explained that a specific union member, Michael Cormier, had accidentally overpaid her by $100 for his dues. Reams Declaration, RE 27-1, PageID #1160; Allen Deposition @ Exhibit 3, RE 27-5, PageID #1287. Reams identified Cormier by his registration number (38804), and gave a written summary that Cormier had thought he was $100 short so he paid the additional $100 to Reams and she gave him $15 in change, when in fact, she had miscounted the funds and should have given him $115 in change. Allen Deposition @ Exhibit 3, RE 27-5, PageID #1287. Thus, the "red bag," which is used to house the cash paid for dues, was over by $100, and this created the imbalance on the cash sheet. Allen Deposition @ Exhibit 3, RE 27-5, PageID #1287.

As to the remaining $40 that was part of the alleged overage, it was quickly determined that this was simply petty cash that Reams had mistakenly put in the "red bag" instead of in the petty cash box. Reams Declaration, RE 27-1, PageID #1160; Allen Deposition @ Exhibit 3, RE 27-5, PageID #1287. Thus, the $140 was fully accounted for, and the only actual overage was the $100 that simply needed to be refunded to Cormier. Allen Deposition @ Exhibit 3, RE 27-5, PageID #1287.

Moreover, as to the second issue, since $40 was not accounted for as part of the missing petty cash, that left a balance of $2.57 that was unaccounted. Allen Deposition @ Exhibit 3, RE 27-5, PageID #1287. Given the passage of time from her medical condition, Reams could not recall what specifically this small amount of money could have been used for, so instead, she offered to just pay the $2.57 out of pocket to balance the petty cash amount (supposed to be $150 total). Allen Deposition @ Exhibit 3, RE 27-5, PageID #1287. In response, Bertolone told Reams "to not do anything with it yet." Allen Deposition @ Exhibit 3, RE 27-5, PageID #1287.

Finally, the last issue was likewise rectified upon reviewing the actual PEP inventory reports. Allen Deposition @ Exhibit 3, RE 27-5, PageID #1287. While it was initially stated that Reams' inventory showed one extra sweatshirt in inventory, Bertolone reported that this issue was resolved upon reviewing additional records. Allen Deposition @ Exhibit 3, RE 27-5, PageID #1287. So, upon further investigation, the PEP inventory was correct, and apparently, the only issue was that the report Reams had to use each month to track the inventory needed to be updated. Allen Deposition @ Exhibit 3, RE 27-5, PageID #1287.

The next morning on August 20, 2019, Reams was summoned to another meeting, this time with LaFaso, Bertolone and Dalton. Reams Declaration, RE 27-1, PageID #1161. During this meeting, Dalton told Reams that she was being terminated from her employment. Dalton Deposition, RE 27-3, PageID #1212. Following Reams'

termination, Appellee replaced her with a new hire, Shawna Poore, an individual without any known disability. LaFaso Deposition, RE 29-8, PageID #1803; Allen Deposition, RE 27-5, PageID #1283-1284.

### C. Procedural History

Reams filed her Complaint against Appellee on April 27, 2021. Reams filed her Second Amended Complaint on July 23, 2021. Second Amended Complaint, RE 12, PageID #133-146. Appellee filed a Motion for Summary Judgment, which was granted by the district court on February 23, 2023 as a final appealable order. Opinion, RE 30, PageID #1946-1970. Reams timely appealed on March 21, 2023. Notice of Appeal, RE 32, PageID #1972. Specifically, Reams appeals to the Sixth Circuit Court of Appeals to reverse the granting of summary judgment as to Counts I and II of her Second Amended Complaint.

### SUMMARY OF ARGUMENT

**Prima Facie Case for Disability Discrimination:** A prima facie case for disability discrimination under the ADA or R.C. § 4112.02, is established where (1) the employee is disabled or perceived her as disabled by the employer, (2) the employer took adverse employment action, at least in part, because the employee is disabled or otherwise treated the disabled employee differently than similarly-situated non-disabled employees, and (3) the employee, though disabled, can safely and substantially perform the job's essential functions, with or without reasonable accommodation. *Hood v.*

*Diamond Products, Inc.*, 74 Ohio St.3d 298, 1996 Ohio 259, 658 N.E.2d 738. Here, Appellee does not dispute any of the prima facie elements, other than Reams' underlying disability.

An individual is considered "disabled" for purposes of a discrimination claim if she has "a physical or mental impairment that substantially limits one or more major life activities, including the functions of caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working; a record of a physical or mental impairment; or being regarded as having a physical or mental impairment." R.C. § 4112.01(A)(13). Moreover, a condition which may be largely controlled by medication, is still a disability under the ADAAA because the ameliorative effects of medication <u>cannot</u> be taken into account when determining whether a mental impairment constitutes a disability, per Section 12102(4)(E) of the ADAAA. 42 U.S.C. § 12102(4)(E)(i)(I).

In the present matter, there is no dispute that Reams satisfies the "physical impairment" prong of the disability test. Moreover, the Court must analyze Reams' condition as it existed during her employment between July 26, 2019 (the onset of the condition) and her termination on August 20, 2019. During that time, it is undisputed that Reams was taking Coumadin as a blood thinner to help prevent her artery from clotting, which could cause her to suffer a stroke. Per the ADAAA, the Court must consider the symptoms of Reams' condition, *without* the ameliorative effects of

11

Coumadin. Furthermore, in this case, Reams' medical records support her position.

Specifically, Dr. Kung, Ream's neurologist, reflected the following in Reams'

September 26, 2019 office visit:

> Patient is a 37-year-old female suffered a right ICA and left vertebral artery dissection in July 2019 and was noted on a diagnostic cerebral angiogram to have irregular left vertebral artery and 70% stenosis of the right internal carotid artery associated with a pseudoaneurysm.

> BIO MSJ, RE 27, PageID #1118-1157 @ Exhibit 2.

To this end, the Code of Federal Regulations, 29 C.F.R. § 1630.2(i)(1)(ii),

defines "major life activities" to include:

> The operation of a major bodily function, including functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, **circulatory**, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and **reproductive** functions. The operation of a major bodily function includes the operation of an individual organ within a body system.

Thus, at the very least, Reams' condition substantially limited her circulatory

system, and overtly threatened that function of her body if her blood were to clot and

cause her to suffer a stroke.

**Pretext for Wrongful Termination**: It is axiomatic that an employee can

refute the legitimate, nondiscriminatory reason articulated by an employer "by showing

that the proffered reason (1) has no basis in fact, (2) did not actually motivate the

defendant's challenged conduct, or (3) was insufficient to warrant the challenged

conduct." *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000). Moreover, to

survive summary judgment, a plaintiff "need not raise a genuine issue as to whether [the employer] acted with discriminatory intent, he need only raise a genuine issue […] that its purported reason for acting was factually false." *Pollitt v. Roadway Express, Inc.*, 228 F.Supp.2d 854, 878 (S.D. Ohio 2002).

When examining whether a plaintiff can establish that a proffered reason for termination is actually pretext, the Sixth Circuit cautioned that "**in discrimination and retaliation cases, an employer's true motivations are particularly difficult to ascertain**" and therefore specific allegations or evidence by the plaintiff are not necessary in order to create a genuine issue of material fact. *Singfield v. Akron Metro. Hous. Authority*, 389 F.3d 555 (6th Cir. 2004). A plaintiff using the second pretext option "admits the factual basis underlying the employer's proffered explanation and further admits that such conduct could motivate dismissal," but "attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was more likely than that offered by the Appellee." *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1081, 1084 (6th Cir. 1994).

Here, Appellee and the district court focused on two alleged errors: the $140 overage (which included $40 of petty cash that was simply placed in the wrong bag), and an extra $2.57 in petty cash. As the alleged $100 dues overage, Reams produced the documented receipt showing that Cormier (R 38804) was the individual who had mistakenly overpaid Reams by $100, and her error was simply giving him back the

wrong amount of change. Moreover, this discrepancy would have easily been caught and fixed by Reams and Roberts the following Monday (per their usual routine) had Reams not ended up in the hospital with her disability. Even so, this was the same type of clerical mistake for which Reams never received any disciplinary action over the past three-plus years of her employment.

Moreover, as the same alleged $100 overage, Appellee admittedly never refunded that money to anyone. So, while Dalton and LaFaso went to great lengths to talk up the "seriousness" of these types of money issues, the reality is that Appellee never even returned this money to any union member, and yet, never faced any repercussions for that action, including not even being questioned about it by the DOL. These facts raise a question of fact as to whether this conduct, even if true, was serious enough to Appellee to actually motivate Reams' termination. Indeed, there is absolutely nothing in the record to suggest that this $100 overage was any different from any past overage issue Reams dealt with in the prior three-plus years of her employment. The only variable that had changed between those prior three years and August 20, 2020— Reams' disability and hospitalization.

Separately, as to the $2.57 in petty cash, again, Appellees' conduct (or lack thereof) is evidence cutting against summary judgment. Indeed, the record shows that: (1) the DOL never said a thing to Appellee about this allegedly missing $2.57 in petty cash, and (2) Appellee, via LaFaso, admits that he could not even recall if Appellee ever

replaced that money. Despite this, the district court clung to unsupported conjecture from LaFaso that missing petty cash is a "pretty big deal." LaFaso Deposition, RE 29-8, PageID #1788. Yet, the district court missed the connection that if tracking petty cash is a "big deal," then evidence that the missing $2.57 was never accounted for and was not even investigated, or remedied, by Appellee is pretty significant evidence cutting against the notion that Appellee was motivated to terminate Reams for this reason. Combined with the fact that Reams had, once again, never been counseled or disciplined for making similar clerical mistakes like this in the past, it raises a question of fact whether her recent disability and hospitalization acted as a motive for different treatment she was now receiving for the same type of alleged conduct.

For these reasons, and the analysis that follows, Reams respectfully requests that this Honorable Court reverse the district court's granting of summary judgment as to Counts I and II of Reams' Second Amended Complaint.

## ARGUMENT

### I.  STANDARD OF REVIEW

Summary judgment is reviewed by this Court *de novo. Dews v. A.B. Dick Co.*, 231 F.3d 1016 (6th Cir. 2000). The moving party "bears the burden of *proving* that there are no genuine issues of material fact." *Phillips v. Roane County, Tenn.*, 534 F.3d 531, 538 (6th Cir. 2008). The non-moving party must then "come forward with 'specific facts showing a genuine issue for trial.'" *Merriweather v. Zamora*, 569 F.3d

307, 313 (6th Cir. 2009). A court must review all facts and inferences in a light most favorable to the non-moving party. *Hall v. Spencer County, Ky.*, 583 F.3d 930, 933 (6th Cir. 2009). Lastly, if the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505 (1986).

## II.  THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT AS TO REAMS' DISABILITY DISCRIMINATION CLAIMS.

### A. Reams' Federal And State Disability Discrimination Claims Can Be Analyzed Together.

Counts I and II of Reams' Complaint set forth that she was disparately treated and wrongfully terminated based on her disability in violation of the ADA, 42, U.S.C. § 12101 *et seq.* and R.C. § 4112.02. Second Amended Complaint, RE 12, PageID #133-146. These claims can be analyzed together. *Brenneman v. MedCentral Health Sys*., 366 F.3d 412, 418 (6th Cir. 2004).

### B. Reams Has Met Her Prima Facie Case.

A prima facie case for disability discrimination under the ADA or R.C. § 4112.02, is established where (1) the employee is disabled or perceived her as disabled by the employer, (2) the employer took adverse employment action, at least in part, because the employee is disabled or otherwise treated the disabled employee differently than similarly-situated non-disabled employees, and (3) the employee, though disabled,

can safely and substantially perform the job's essential functions, with or without reasonable accommodation. *Hood v. Diamond Products, Inc.*, 74 Ohio St.3d 298, 1996 Ohio 259, 658 N.E.2d 738; *Columbus Civil Service Commission v. McGlone*, 82 Ohio St.3d 569, 1998 Ohio 410, 697 N.E.2d 204.

Per its Motion for Summary Judgment, Appellee only attempted to challenge one element of Reams' prima facie case, that she is disabled. MSJ, RE 26, PageID # 316-355. Thus, for purposes of summary judgment, and this appeal, Appellee acknowledges a genuine issue of material fact as to elements 2-5 of Reams' disability discrimination claims.

Moreover, Reams had a qualifying disability during her employment. Several facts are not in dispute: first: that Reams suffered a torn carotid artery during her employment with Appellee; two: that Reams' condition caused her to suffer at 70 percent blockage in that artery; three: that Reams' condition forced her to take Coumadin in a regular basis over the course of the next five months to thin her blood and reduce the chance of clots; and four: that Reams' condition placed her at a heightened risk for stroke, including TIAs (Transient ischemic attack).

An individual is considered "disabled" for purposes of a discrimination claim if she has "a physical or mental impairment that substantially limits one or more major life activities, including the functions of caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working; a record of a

physical or mental impairment; or being regarded as having a physical or mental impairment." R.C. § 4112.01(A)(13). Moreover, since the adoption of the ADAAA, the definition of "disability" has broadened. Specifically, the Code of Federal Regulations, 29 C.F.R. § 1630.2(j) states in part:

> (i) The term "substantially limits" shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. "Substantially limits" is not meant to be a demanding standard.

> (ii) An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Nonetheless, not every impairment will constitute a disability within the meaning of this section.

> (iii) The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity. Accordingly, the threshold issue of whether an impairment "substantially limits" a major life activity should not demand extensive analysis.

> (iv) The determination of whether an impairment substantially limits a major life activity requires an individualized assessment. However, in making this assessment, the term "substantially limits" shall be interpreted and applied to require a degree of functional limitation that is lower than the standard for "substantially limits" applied prior to the ADAAA.

Moreover, a condition which may be largely controlled by medication, is still a disability under the ADAAA because the ameliorative effects of medication cannot be

taken into account when determining whether a mental impairment constitutes a disability, per Section 12102(4)(E) of the ADAAA:

> (E)
>
> (i) The determination of whether an impairment substantially limits a major life activity shall be made **without regard to the ameliorative effects** of mitigating measures such as
>
> > (I) **medication**, medical supplies, equipment, or appliances, low-vision devices (which do not include ordinary eyeglasses or contact lenses), prosthetics including limbs and devices, hearing aids and cochlear implants or other implantable hearing devices, mobility devices, or oxygen therapy equipment and supplies;
>
> 42 U.S.C. § 12102(4)(E)(i)(I). (**Emphasis** added).

Moreover, per Code of Federal Regulations section § 1630.2(j)(vii), "An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." 29 C.F.R. § 1630.2(j)(1)(vii). This standard is coupled with the fact that the definition of *actual* disability does not include the "transitory and minor" analysis, meaning, "The effects of an impairment lasting or expected to last fewer than six months can be substantially limiting within the meaning of this section." 29 C.F.R. § 1630.2(j)(1)(ix).

In the present matter, there is no dispute that Reams satisfies the "physical impairment" prong of the disability test. Moreover, there is evidence raising a question of fact that her impairment substantially limited one or more major life activities. To begin, the Court must analyze Reams' condition as it existed during her employment between July 26, 2019 (the onset of the condition) and her termination on August 20,

2019. During that time, it is undisputed that Reams was taking Coumadin as a blood thinner to help prevent her artery from clotting, which could cause her to suffer a stroke. Per the ADAAA, the Court must consider the symptoms of Reams' condition, *without* the ameliorative effects of Coumadin. Stated another way, the Court must analyze Reams' disability, a torn carotid artery with 70 percent blockage, as if Coumadin and other blood thinners did not exist. This realization alone should be sufficient to inform all parties in this matter that Reams' condition was just "substantially limiting," it was life-threatening.

Moreover, even though Reams has done so in this case, she is not legally required to present evidence from a physician or expert in order to support a finding that she is disabled. On point, the Ohio Supreme Court flatly rejected this same argument in *Hood v. Diamond Products, Inc.*, holding that the plaintiff's own testimony regarding her cancer condition was sufficient Rule 56 evidence to support the "disability" element of her disability discrimination claim. 74 Ohio St.3d 298, 303-04, 658 N.E.2d 738, 1999 Ohio 259. Recently, the United States District Court for the Southern District of Ohio held the same in *McGriff v. Beavercreek City School District*, 2021 WL 2401921 (S.D. Ohio). *See also Morrissey v. Laurel Health Care Co.*, 946 F.3d 292, 300 (6th Cir. 2019). Therein, the employer argued that the plaintiff was unable to demonstrate that her fibromyalgia constituted a disability under the ADA because she failed to provide

any expert testimony regarding whether it substantially limited a major life activity. The

district court disagreed and held that the plaintiff's own testimony was sufficient:

> To establish a prima facie case of disability and show that she is
> "actually disabled" under this first definition of disability, **McGriff is
> not required to present expert testimony diagnosing her
> fibromyalgia**. *Morrissey v. Laurel Health Care Co.*, 946 F.3d 292, 300
> (6th Cir. 2019) (plaintiff need not show that her disability renders her
> unable to work and need not tell her employer about her specific
> diagnosis). Instead, McGriff need only show that her impairment
> substantially limits one or more of her "major life activities." Although
> Appellee argues that Plaintiff failed to identify a major life activity
> impaired by her fibromyalgia and only testified to being unable to
> exercise and participate in her favorite hobbies, her testimony also
> included difficulty sleeping and concentrating resulting in fatigue and
> anxiety. These symptoms required her to rest in the middle of her
> teaching day. She has also stated that fibromyalgia affects her nerve
> endings, ability to withstand extreme heat and cold and that it causes
> sciatica. She testified that the fatigue was exacerbated by traveling to
> Ferguson Hall.

> *Id.* @ *8. (**Emphasis** added).

This holding echoes the Code of Federal Regulations' language that the

"substantially limits" analysis for an ADA disability is not an extensive one:

> The primary object of attention in cases brought under the ADA should
> be whether covered entities have complied with their obligations and
> whether discrimination has occurred, not whether an individual's
> impairment substantially limits a major life activity. Accordingly, **the
> threshold issue of whether an impairment "substantially limits" a
> major life activity should not demand extensive analysis**.

> The comparison of an individual's performance of a major life activity
> to the performance of the same major life activity by most people in the
> general population **usually will not require scientific, medical, or
> statistical analysis**. Nothing in this paragraph is intended, however, to
> prohibit the presentation of scientific, medical, or statistical evidence to
> make such a comparison where appropriate.

21

29 C.F.R. § 1630.2(j)(1)(iii) and (v). (**Emphasis** added).

Case law since the ADAAA has reflected this relaxed standard. *See e.g.*
*Bloomfield v. Whirlpool Corp.*, 984 F.Supp.2d 771 (N.D. Ohio 2013); *Chaniott v.*
*DCI Donor Services, Inc.,* 481 F.Supp.3d 712 (M.D. Tenn. 2020); *Mullenix v.*
*Eastman Chemical Company*, 237 F.Supp.3d 695 (E.D. Tenn. 2017), *Watkins v.*
*Shriners Hospitals for Children*, *Inc*., 2020 WL 2309468 (E.D. KY). Still, in this
case, Reams' medical records support her position. Specifically, Dr. Kung, Ream's
neurologist, reflected the following in Reams' September 26, 2019 office visit:

> Patient is a 37-year-old female suffered a right ICA and left vertebral
> artery dissection in July 2019 and was noted on a diagnostic cerebral
> angiogram to have irregular left vertebral artery and 70% stenosis of the
> right internal carotid artery associated with a pseudoaneurysm.

> BIO MSJ, RE 27, PageID #1118-1157 @ Exhibit 2.

On point, the Code of Federal Regulations defines "major life activities" to
include:

> The operation of a major bodily function, including functions of the
> immune system, special sense organs and skin; normal cell growth; and
> digestive, genitourinary, bowel, bladder, neurological, brain,
> respiratory, **circulatory**, cardiovascular, endocrine, hemic, lymphatic,
> musculoskeletal, and **reproductive** functions. The operation of a major
> bodily function includes the operation of an individual organ within a
> body system.

> 29 C.F.R. § 1630.2(i)(1)(ii). (**Emphasis** added).

Here, Reams' records confirm that she not only suffered a 70 percent stenosis
(blockage of her blood flow) through her carotid artery, but she also suffered a
pseudoaneurysm, which the Cleveland Clinic has defined as "a pooling of blood caused

by injury to your blood vessel."[1] Thus, at the very least, Reams' condition substantially limited her circulatory system, and overtly threatened that function of her body if her blood were to clot and cause her to suffer a stroke.

In its Motion, Appellee attempted to focus on Reams' deposition testimony whereby she was asked her ability to perform certain major life activities *after* her condition had improved. MSJ, RE 26, PageID #340-341. This questioning, again, loses sight of the analysis that Reams' disability must be viewed as any episodic-type condition—i.e. whether it is substantially limiting when "active" or otherwise at its worst. Regardless, Reams testified that one of the life-long impacts of her condition is the fact that she was given a recommendation "not to have children." Reams Deposition, RE 29-1, PageID #1383. Thus, there is evidence that her carotid artery condition substantially limited her ability to have children (i.e. her reproductive function). *See* 29 C.F.R. § 1630.2(i)(1)(ii). Thus, this evidence, including Reams' testimony, and her medical records, create a genuine issue of material fact regarding the first element of her prima facie case.

### C. There Is Evidence Of Pretext Supporting Reams' Claims.

#### *1. The Law.*

Once a plaintiff establishes a prima facie case of disability discrimination the burden shifts to the employer to set forth some legitimate, nondiscriminatory reason for

---

[1] *See* https://my.clevelandclinic.org/health/diseases/23250-pseudoaneurysm

the action taken. *Plumbers & Steamfitters Joint Apprenticeship Commt. v. Ohio Civ. Rights Comm.*, 66 Ohio St.2d 192, 197, 421 N.E.2d 128, 132 (1981). If the employer does so, then the employee must raise a genuine question of fact that the employer's stated reason was a pretext for discrimination. *Id.* @ 198.

Moreover, when examining whether a plaintiff can establish that a proffered reason for termination is actually pretext, the Sixth Circuit cautioned that "**in discrimination and retaliation cases, an employer's true motivations are particularly difficult to ascertain**" and therefore specific allegations or evidence by the plaintiff are not necessary in order to create a genuine issue of material fact. *Singfield v. Akron Metro. Hous. Authority*, 389 F.3d 555 (6th Cir. 2004) (**Emphasis** added) citing *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716, 103 S. Ct. 1478, 75 L. Ed. 2d 403 (1983) (acknowledging that discrimination cases present difficult issues for the trier of fact, as "[t]here will seldom be 'eyewitness' testimony as to the employer's mental processes").[2] Even if the Court believes there is enough evidence to support a legitimate reason for termination, Reams can refute the legitimate, nondiscriminatory reason articulated by Appellee "by

---

[2] The Court in *Singfield* further stated that such factual determinations are frequently inappropriate for summary judgment. *Id*. (citing *Lowe v. City of Monrovia*, 775 F.2d 998, 1009 (9th Cir. 1985) (stating that very little additional evidence is required to raise a genuine issue of fact regarding motive, and concluding that summary judgment on the merits is ordinarily inappropriate once a *prima facie* case has been established)).

showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the Appellee's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000). In order to meet this burden, Reams need only "create a factual dispute that the explanation is a pretext for [discrimination]." *Williams v. Time Warner Cable*, 1998 Ohio App. LEXIS 2793, No. 18663 (9th Dist.). Importantly, to survive summary judgment, a plaintiff "need not raise a genuine issue as to whether [the employer] acted with discriminatory intent, he need only raise a genuine issue […] that its purported reason for acting was factually false." *Pollitt v. Roadway Express, Inc.*, 228 F.Supp.2d 854, 878 (S.D. Ohio 2002); *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

Relevant to the case at bar, the same evidence can support both a plaintiff's prima facie case and a finding of pretext. *M.L. v. Williamson County Board of Education*, 772 Fed.Appx. 287, 292 (6th Cir. 2019).[3] Moreover, "Although the presumption created by the prima facie case disappears once the employer meets its burden of production, 'the trier of fact may still consider the evidence establishing the plaintiff's

---

[3] *See also Cantrell v. Nissan N. Am. Inc*., 145 Fed.Appx. 99, 108 (6th Cir. 2005) (The overlap between the causal connection requirement and a showing [of pretext] is implicitly recognized in our case law, which permits both to be proven by the same type of evidence.); *Cannon v. Univ. of Tennessee*, 2017 WL 2189565, *15 (E.D. Tenn.) (analyzing evidence of causal connection and pretext together because "the same circumstances which establish a causal connection ... may serve as sufficient evidence of pretext.").

prima facie case "and inferences properly drawn therefrom * * * on the issue of whether the defendant's explanation is pretextual."'" *Nelson v. Univ. of Cincinnati*, 2017-Ohio-514, ¶ 35 (10th Dist.), quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). To that end, a causal connection is shown through direct evidence or through knowledge coupled with a closeness in time that creates an inference of causation. *Nguyen v. Cleveland*, 229 F.3d 559, 566 (6th Cir. 2000); *Meyers v. Goodrich Corporation*, 2011 Ohio 3261 (8th Dist.). Temporal proximity alone can satisfy the causal connection, as explained by the Sixth Circuit Court of Appeals in *Mickey v. Zeidler Tool and Die Company*. 516 F.3d 516 (6th Cir. 2008). *See also DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004).

  *2. There Is A Question Of Fact That Appellee's Allegations Did Not Actually Motivate Reams' Termination, Or Were Otherwise Insufficient To Warrant Termination.*

A plaintiff using the second pretext option "admits the factual basis underlying the employer's proffered explanation and further admits that such conduct could motivate dismissal," but "attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was more likely than that offered by the Appellee." *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1081, 1084 (6th Cir. 1994).

***The $140 Overage***

Here, Appellee made three separate allegations against Reams, the first being that there was an overage of $140 in union dues. However, this allegation fails under multiple pretext theories, including it lacking any basis in fact. To begin, there are factual inaccuracies in Appellee's own corner as to the actual amount of the alleged overage. Roberts testified that it was $300, (Roberts Deposition, RE 27-6, PageID #1309-1310) which is false, and then the allegation became that the overage was $140. Allen Deposition, RE 27-5, PageID #1287-1288 @ Exhibit 3. Upon further inspection, that number was wrong as well because $40 of that amount was actually petty cash that was accounted for, but was simply placed in the wrong bag on Reams' desk. Allen Deposition, RE 27-5, PageID #1287-1288 @ Exhibit 3.

From there, when Appellee spoke to Reams on August 19 about this overage, she produced the documented receipt showing that Cormier (R 38804) was the individual who had mistakenly overpaid Reams by $100, and her error was simply giving him back the wrong amount of change. Allen Deposition, RE 27-5, PageID #1287-1288 @ Exhibit 3. This lined up with Reams' message to Roberts on July 26, before she left for her appointment, that there was an error in the cash sheet that needed to be balanced. Reams Declaration, RE 27-1, PageID #1158-1161. Thus, had Reams never suffered her injury and returned to work on Monday, this issue would have easily been rectified by the standard dual-review by Reams and Roberts. Indeed, a cursory

review of Exhibit B from Reams' deposition demonstrates that she had encountered these types of overpayments and underpayments several times in the past, which would prompt Reams to look into the matter and eventually either refund the member the overpaid amount or collect additional dues if the member had underpaid. MSJ @ Exhibit K, RE 26-12, PageID #882-1004. These were the same issues and mistakes for which Reams never received any disciplinary action over the past three-plus years of her employment.

Here, the sequence of events raises a question of fact whether the Cormier overpayment actually motivated Reams' termination because despite her explanation of the overpayment and specifically linking the payment to Cormier through the receipt, Appellee never refunded him the money. In fact, Appellee admittedly never refunded that money to anyone. So, while Dalton and LaFaso went to great lengths to talk up the "seriousness" of these types of money issues, the reality is that Appellee never even returned this money to any union member, and yet, never faced any repercussions for that action, including not even being questioned about it by the DOL. Dalton Deposition, RE 27-3, PageID #1226-1228. Thus, Appellee's conjecture that Reams committed a *serious* error that was akin to "stealing from a member" is not supported, at all, by the actual facts and evidence. Rather, there is absolutely nothing in the record to suggest that this $100 overage was any different from any past overage issue Reams dealt with in the prior three-plus years of her employment. The only variable that had

28

changed between those prior three years and August 20, 2020—Reams' disability and hospitalization. Given this evidence, a reasonable jury could determine that the alleged $100 overage did not actually motivate Reams' termination, and could even determine that this excuse lacks any basis in fact, especially after it was rectified through receipt documentation.

In its decision, the district court held that Appellee "reasonably" terminated Reams based on the $140 overage, in part, because Reams allegedly testified that the "discrepancy was legitimate." Opinion, RE 30, PageID #1965, *citing to* Reams Deposition, RE 29-1, PageID #1383. However, Reams did not testify that this allegation was "legitimate," rather, she admitted the truth, that there was a discrepancy—one **that she herself** pointed out to Roberts before she left for her chiropractor appointment, noting to Roberts that they would have go through their usual process to find/fix the discrepancy. Reams Declaration, RE 27-1, PageID #1158-1161; Roberts Deposition, RE 27-6, PageID #1310. However, Reams was unable to engage in this audit process because she suffered an injury to her neck and had to be hospitalized.

The district court then justified Appellee's reliance upon this discrepancy as a means for termination by stating, "Plaintiff had been notified and counseled about her errors on numerous occasions throughout her employment with Defendant." Opinion, RE 30, PageID # 1966. However, there is no evidence remotely supporting that Reams was ever disciplined, or even "counseled" for any of these prior alleged errors. Indeed,

the district court points to Appellee's Exhibit J, specifically pages 1-2, 4-5, 7-13, however, review of these same pages does not reveal any counseling being given to Reams, rather, at best, these documents illustrate the commonality that corrections would be needed to cash sheets (see pages 7-13) and Reams would fix them upon inspection and return them. Indeed, the only document in Exhibit J that remotely givens any type of counseling or future direction to Reams is page 1 where she is asked to "please be careful when typing these up," referring to an initiation report back in December 2018. MSJ Exhibit J, RE 26-10, PageID #714.

Besides this, the *only* other "evidence" of any kind supporting the idea that Reams had every been counseled or disciplined prior to her termination for any alleged performance issues came from a general statement from Allen stating, "So yes, we did have conversations indicating, you know, these errors aren't acceptable." Allen Deposition, RE 26-8, PageID #615. Allen's self-serving testimony aside, she admitted in the same deposition that she **never once** documented a single instance of this alleged "verbal coaching" she gave to Reams. Allen Deposition, RE 26-8, PageID #610. In fact, Allen admitted exactly what the record shows, that there is not a single written note or document in Reams' file where Allen ever counseled or warned her about any alleged errors of any kind, and certainly nothing pertaining to ever disciplining her for these same alleged errors. Allen Deposition, RE 26-8, PageID #610. Reams confirmed the

same in her own declaration, which at worst, offsets Allen's testimony, and creates a question of fact as to this issue.[4] Reams Declaration, RE 27-1, PageID # 1158-1161.

Thus, there is evidence in the record that calls in question whether Reams had been previously coached, counseled or disciplined about prior errors, and therefore, whether Appellee was actually motivated to terminate Reams based upon any such performance history. Indeed, under the second pretext theory, the issue before this Court is not whether the $140 overage did occur, but rather, *assuming the allegation is true*, did it actually motivate Appellee to terminate Reams. The very idea of this argument is out of line with the evidence herein, because Appellee wants this Court to believe that it patently ignored **years** of Reams allegedly making errors with paperwork and handling money (see Exhibit K to MSJ, RE 26-11, 26-12, PageID #727-1004) without disciplining or even providing written counseling to Reams, but then, on one fateful day in August 2019, one of these same alleged errors suddenly calls for her immediate termination. Appellee presently no credible evidence supporting such a motivation, including why it would suddenly act differently now versus before, and more

---

[4] *See Valentin v. 1245, LLC*, 2023 WL 3318390 (11th Cir., May 9, 2023). (We have stated that the nonmoving party may rely on self-serving affidavits to withstand a motion for summary judgment. *United States v. Stein*, 881 F.3d 853, 858 (11th Cir. 2018)(en banc). Further, we explained that Federal Rule of Civil Procedure 56 does not "require an otherwise admissible affidavit be corroborated by independent evidence." *Id.* Thus, "even in the absence of collaborative evidence, a plaintiff's own testimony may be sufficient to withstand summary judgment." *Id.*).

importantly, even to the extent such evidence does exist in the record, it does not eliminate all genuine issues of material fact for a jury. Thus, the district court should not have granted summary judgment on the issue of pretext.

### The Remaining $2.57 In Petty Cash

Next, Appellee argues that Reams was terminated because it could not account for $2.57 of petty cash. Again, Appellee's first accusation was that it was missing $42.57 in petty cash, however, that position faded away once a simple accounting was done and it was determined that $40 was simply placed in the wrong location. Allen Deposition @ Exhibit 3, RE 27-5, PageID #1287-1288. This left Appellee clinging to the argument that Reams was responsible for $2.57 missing from petty cash. Once more, Appellee's entire position that this was a *serious* offense by Reams comes down to its unsupported testimony that the "DOL would come down" on Appellee for any missing money. Dalton Deposition, RE 27-3, PageID #1225. However, reality once again tells a different story, and the record shows that: (1) the DOL never said a thing to Appellee about this allegedly missing $2.57 in petty cash, and (2) Appellee, via LaFaso, admits that he could not even recall if Appellee ever replaced that money. LaFaso Deposition, RE 27-4, PageID #1244-1246. Thus, raises a few points: first, it raises a question of fact as to whether Reams' termination was actually motivated by an allegedly missing $2.57, an amount Reams even offered to simply pay out of pocket if necessary; and two, it raises a question of fact of whether the allegedly missing $2.57

32

was even sufficient to warrant Reams' termination. Again, the only variable that had changed between those events was Reams' disability.

The district court, while acknowledging that Reams presented testimony and evidence that Appellee did not investigate the missing $2.57 in petty cash and could not even recall whether that money was ever replaced or accounted for (despite it allegedly being *important*), nevertheless, again weighed the evidence in Appellee's favor by stating there was evidence "speaking to the seriousness of petty cash discrepancies." Opinion, RE 30, PageID #1966. Yet, to support this assertion, the district court merely pointed to LaFaso's unsupported comment that missing petty cash is a "pretty big deal." LaFaso Deposition, RE 29-8, PageID #1788. However, even if this testimony were true and petty cash must be accounted for "down to the penny," this is precisely why Appellee's conduct in this matter is so powerful in refuting Appellee's position—if tracking petty cash is a "big deal," then evidence that the missing $2.57 was never accounted for and was not even investigated, or remedied, by Appellee is pretty significant evidence cutting against the notion that Appellee was motivated to terminate Reams for this reason. In fact, while LaFaso testified that accounting for every cent of petty cash is important, he and Appellee's actions in this case speak otherwise. Hence, at best, there is question of fact regarding what Appellee is saying **should** happen, versus what actually **did** happen with respect to Reams. The district court totally missed

the point of this evidence, or worse, disregarded it completely in reaching a *weighted* decision in Appellee's favor on summary judgment.

Furthermore, the district court then points to a general proposition in *Williams v. Holt* that a plaintiff cannot "sit back" and "poke holes in the moving party's summary judgment motion." 2006 U.S. Dist. LEXIS 55148, *3-4 (E.D. Tenn.). Specifically, the district court accused Reams of not "provid[ing] any evidence supporting her position that missing funds from petty case is not a serious offense." Opinion, RE 30, PageID #1967. Yet, the district court is attempting to force an impermissible burden on Reams. She is not responsible for disproving every unsupported contention or statement made by the Appellee. Rather, as the moving party, Appellee faces the initial burden of presenting evidence supporting its motion for summary judgment. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548 (1986). If Appellee makes an assertion that it cannot support with any evidence, including by showing actual conduct supporting that assertion, the contention itself does not become evidence for which the non-moving party much now disprove in order to survive summary judgment. Such a standard would make it virtually impossible for a plaintiff to ever overcome summary disposition because an employer would be free to make up any story they wanted, leaving the employee in a position or either disprove it (regardless of how unsupported the assertion is to begin with) or face dismissal. Here, the fact remains that Appellee set forth a contention that an alleged missing $2.57 from petty cash

34

was significant in some way, however, it never presented any evidence, other than a general statement from LaFaso, to even begin to support that position. And on the contrary, Appellee's action in handling the missing $2.57 *proves* the opposite, or at the very least, creates a factual dispute as to that issue – one that could certainly be of interest to a fact-finding jury.

Finally, in holding that Reams "has not carried her burden" in showing that the $2.57 petty cash excuse was a pretext for discrimination, the district court does not even address, let alone analysis the connection between Reams' disability (including her termination date being her first day back to work after her hospital stay). Again, it cannot be discounted that every other alleged "error" or discrepancy Reams had over the course of several years working with Appellee, she was never once given any coaching or disciplinary action, yet, now immediately following her hospitalization for her torn carotid artery, she is terminated over an accusation that $2.57 is missing from petty cash—an issue that Appellee cared so little about, it did not even attempt to locate or replace the funds. This radial change in the way Appellee treated this alleged transgression by Reams versus prior instances, if not alarming, at the very least, leaves some doubt to be resolved by a jury.

### *Past Alleged Errors*

Lastly, Appellee alleges that Reams' past alleged errors, dating all the way back to 2016, also led to her termination. Even if this argument was factual, it involves a

35

credibility determination that only the jury can make. Moreover, Appellee's position is vulnerable to several pretext theories: first, Reams has shown that at least some of these past alleged errors were not errors at all, and thus, there is a "no basis in fact" question for the jury; and two, there is a question of fact of whether any of these alleged past errors actually motivated Reams' termination for the reasons already stated (no prior discipline over the past three-plus years). LaFaso Deposition, RE 27-4, PageID #1248-1266; Reams Deposition, RE 29-1, PageID #1375, 1377-1378. Again, the question the jury will ultimately need to answer is "why did these alleged errors not matter then, but they do now?" The jury should get the chance to answer these questions of fact and review the evidence, thus, summary judgment should be denied.

In its Opinion, the district court again relies wholly on unsupported conjecture from Appellee's witnesses, including Roberts, who testified that Reams "made anywhere between 60 and 75 percent more errors in the short time that she was here…" Roberts Deposition, RE 26-7, PageID #588. The district court relied on this statement without questioning it despite the fact that Roberts would have absolutely no basis or ability to know, much less quantify the "number of errors" Reams made as a clerk versus when Roberts worked in that position. It is an absurd statement, and one the district court should have rejected outright given the lack of any supporting evidence. To the contrary, Roberts admitted that she made the same types of errors during her employment as a clerk. Roberts Deposition, RE 27-6, PageID #1298, 1318-1320. Yet,

the district court would seemingly hold Reams to the burden of having to "disprove" this unsupported statement by seemingly presenting evidence that she did not commit 65-70 percent more errors than Roberts, as if that was remotely possible to prove one way or the other. Again, applying these type of off-hand, unsupported statements as "evidence" supporting summary judgment would set a impossible standard for employees to overcome.

This case is factually similar to *Babb v. Maryville Anesthesiologists P.C.*, where the Sixth Circuit Court of Appeals reversed the district court's granting of summary judgment as to the plaintiff's disability discrimination claim, and specifically examined the "reasonableness" of the employer's alleged excuse that the employee was terminated for "clinical errors" where there was evidence that both challenged the veracity of those alleged errors and more importantly, challenged the position that the employee was "actually" terminated for those alleged errors. 942 F.3d 308 (6th Cir. 2019). In it opinion, the Court noted the following:

> More specifically, we ask whether the district correctly determined that no genuine dispute of fact existed as to *why* Maryville fired Babb. [*Emphasis* in original]. We think it did not. Two particular fact disputes undergird this conclusion.

> First, there is a factual dispute as to the reasonableness of Maryville's decision to base Babb's termination on the two "clinical errors" discussed above. See *Risch*, 581 F.3d at 391 (observing that "**evidence which challenges the reasonableness of the employer's decision**" can "**shed[ ] light on whether the employer's proffered reason for the employment action was its actual motivation**").

\* \* \*

37

Second, even if we accepted Maryville's description of the magnitude of Babb's clinical errors as the gospel truth, we would still be faced with an even more glaring factual dispute: **whether those clinical errors "actually motivated" Maryville to fire Babb** on January 13, 2016.

*Id.* @ 322-323. (**Emphasis** added).

In its Opinion, the district court attempts to discredit *Babb's* application by pointing out that there was "expert testimony" therein regarding the alleged errors, but that fact is inconsequential to the legal principles advanced in *Babb*, including whether there is "**evidence which challenges the reasonableness of the employer's decision**" and if so, whether the alleged errors in question "actually motivated" that decision to terminate the employee. *Id.* While the district court states, "there is no similar dispute here," the record simply does not reflect that; in fact, Reams presented evidence questioning each of the alleged infractions against her – including the alleged seriousness of the allegations. Rather than recognize this and deny summary judgment, the district court took the next step and decided these issues, and in effect, improperly assumed the role of the jury.

Finally, the district court then applies a "totality of the circumstances" analysis in rejecting the evidence that Reams was never disciplined a single time in her career, prior to her termination, for any alleged performance errors. The district court basically negates this evidence on its own by stating "Plaintiff had been made aware of mistakes, verbally counseled, and received multiple emails informing her of the mistakes and counseling her to improve in the future." Opinion, RE 30,

PageID #1968. As an initial matter, this statement is not consistent with the record and testimony which raises a dispute over whether Reams was ever counseled at all for these alleged mistakes, including any "verbal counseling." Moreover, Reams previously addressed these alleged counseling "emails," and in reality, there was maybe one such email back in December 2018. Regardless, this is yet another example of the district court playing both the role of the Judge and jury – deciding factual issues. There is certainly a dispute of fact here over whether Reams was counseled, coached and/or disciplined for any alleged mistakes, and likewise, a dispute over whether any "past history" of errors played any role in her termination, especially when considering the complete lack of discipline prior to Reams' injury and hospitalization for such errors versus her immediate termination the day after she returned from medical leave for same type of alleged error. It cannot be said that a reasonable juror could hear these same facts and only come to one conclusion. Therefore, summary judgment should be reversed.

### 3. Appellee Cannot Hide Behind The Honest Belief Rule.

In its Opinion, the district court notes that "the Sixth Circuit has employed a version of the honest belief rule." Opinion, RE 30, PageID #1964. However, based on the facts and evidence in the record, Appellee should not be able to use this rule as a shield to achieve summary judgment.

Under the honest belief rule:

> In order for an employer's proffered non-discriminatory basis for its employment action to be considered honestly held, the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made. If the employer is unable to produce such evidence to support its employment action, then the "honest belief" rule does not apply. Even if the employer is able to make such a showing, the protection afforded by the rule is not automatic.

*See Smith v. Chrysler Corp.*, 155 F.3d 799, 806-808 (6th Cir. 1998).

As stated in *Smith v. Chrysler Corp.*:

> Although courts should resist attempting to micro-manage the process used by employers in making their employment decisions, **neither should they blindly assume that an employer's description of its reasons is honest**. When the employee is able to produce sufficient evidence to establish that the employer failed to make a reasonably informed and considered decision before taking its adverse employment action, thereby making its decisional process "unworthy of credence," then any reliance placed by the employer in such a process cannot be said to be honestly held.

155 F.3d @ 807-808. (**Emphasis** added).

The "key inquiry" under the honest belief rule is "whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Id.; see also Bloomfield v. Whirlpool Corp.*, 984 F.Supp.2d 771, 780 (N.D. Ohio 2014). In *Bloomfield v. Whirlpool Corp.*, the United States District Court for the Northern District of Ohio rejected application of the honest belief rule in a failure to accommodate case under the ADA, holding, "It is not sufficient, however, for Whirlpool to honestly believe the information before it, particularly when the information before it was clearly incomplete." 984 F.Supp.2d @ 780. The district court

further held, "While the honest belief rule does not require the employer's decision-making process leave 'no stone unturned,' Whirlpool has not established that its reliance on incomplete facts was reasonable." *Id.* @ 780-781.

In the present matter, the honest belief rule does not apply for two reasons: first, it is not applicable because the underlying dispute regarding the pretext of Appellee's conduct is not centered around whether Reams made the mistakes in question (i.e. whether there was an initial $100 overage and whether the $40 in petty cash was placed in the wrong bag). Rather, the dispute primarily lies with the question of whether these alleged errors actually motivated Appellee to terminate Reams, given that it was a complete departure from how Appellee had handled past similar issues with Reams (i.e. no prior discipline when a mistake would arise or need to be fixed on a cash sheet, letter, etc.).

Second, if the honest belief rule was applicable to the facts herein, the evidence has shown that Appellee virtually conducted zero investigation into these alleged errors. Indeed, as to the $100 overage, it was Reams, not Appellee, who identified the union member at issue who allegedly overpaid his dues. Despite this, the alleged overpaid dues were never repaid to the member. Moreover, as to the petty cash issue, again, LaFaso admitted that the funds were never replaced, and he could not offer any response as to how that issue was rectified, despite attempting to testify in the same breath that it was a "pretty big deal" to have missing petty cash. Thus,

41

Appellee's story remains that it fired Reams for these allegedly serious errors that were not even serious enough for them to address or remedy—the very same type of clerical mistakes Reams had made in the past, and the very same type of mistakes for which she had never been disciplined for, ever. Again, respectfully, it cannot be said that a reasonable juror could look at these facts, coupled with Reams' disability and hospitalization immediately prior, and only find in favor of Appellee. There are more than a few material questions of fact that remain, and therefore, summary judgment was improper and should be reversed.

## **<u>CONCLUSION</u>**

Based on the foregoing, Reams respectfully requests that the district court's granting of summary judgment be reversed as to Counts I and II of the Second Amended Complaint. Reams further requests that her case be remanded for jury trial.

Respectfully submitted,

*/s/ Fred M. Bean*

Fred M. Bean (0086756)
**THE SPITZ LAW FIRM, LLC**
25825 Science Park Drive, Suite 200
Beachwood, OH  44122
Phone:    (216) 291-4744
Fax:        (216) 291-5744
Email: fred.bean@spitzlawfirm.com

*Attorney for Appellant Heidi Reams*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to FRAP 32(g), Appellant hereby certifies that her Appellant Brief complies with FRAP 32(a)(7)(B)(i) and contains 10,830 words applicable to the word count.

## **CERTIFICATE OF SERVICE**

Appellant certifies that a copy of the foregoing Appellant Brief was filed electronically via the Court's Online ECF Filing System on May 22, 2023 and made available to all parties, including Appellees.

*/s/ Fred M. Bean*
Fred M. Bean (0086756)
**THE SPITZ LAW FIRM, LLC**

## ADDENDUM: DESIGNATION OF DOCUMENTS

1. RE 1, Complaint, PageID #1-13.

2. RE 12, Second Amended Complaint, PageID #133-146.

3. RE 26, Defendant's Motion for Summary Judgment and Exhibits 1-20, PageID #316-1117.

4. RE 27, Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment and Exhibits 1-7, PageID #1118-1338.

5. RE 29, Defendant's Reply Brief in Support of Motion for Summary Judgment and Exhibits 1-12, PageID #1341-1945.

6. RE 30, Memorandum Opinion and Order Granting Summary Judgment, PageID #1946-1970.

7. RE 31, Judgment Entry, PageID #1971.

8. RE 32, Notice of Appeal to the Sixth Circuit Court of Appeals, PageID #1972.