**Case No. 23-3242**

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

_____

HEIDI REAMS

Plaintiff-Appellant,

v.

INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 18

Defendant Appellee.

_____

On Appeal from The United States District Court for the Northern District of Ohio
Case No. 3:21-cv-878, Judge James R. Knepp II

**BRIEF FOR APPELLEE INTERNATIONAL UNION OF OPERATING
ENGINEERS, LOCAL 18**

_/s/ Timothy R. Fadel_
Timothy R. Fadel (0077531)
**Fadel & Beyer, LLC**
The Bridge Building
18500 Lake Road, Suite 300
Rocky River, Ohio 44116
Phone: (440) 333-2050
Fax: (440) 333-1695
Email: tfadel@fadelbeyer.com
_Attorney for Appellee International
Union of Operating Engineers,
Local 18_

i

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Sixth Circuit Rule 26.1, Plaintiff-Appellant makes the following disclosure of corporate affiliations:

1. Is said party a subsidiary or affiliate of a publicly owned corporation?

   **No.**

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?

   **No.**

*/s/ Timothy R. Fadel*
Timothy R. Fadel (0077531)
*Attorney for Defendant-Appellee*
*International Union of Operating Engineers,*
*Local 18*

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES**……………………………………………..v

**STATEMENT OPPOSING ORAL ARGUMENT**……………………….viii

**STATEMENT OF JURISDICTION**…………………………………...1

**STATEMENT OF ISSUES**…………………………………………..1

**STATEMENT OF THE CASE**………………………………………1

**SUMMARY OF ARGUMENT**……………………………………..21

**ARGUMENT**………………………………………………………21

**I.    THE DISTRICT COURT DID NOT ERROR IN GRANTING SUMMARY JUDGMENT AS TO REAMS' DISABILITY DISCRIMINATION CLAIMS**……………………………………...21

   **a.  Reams Failed to Meet Her *Prima Facie* Case**……………………...21

   **b.  Reams Failed to Produce Evidence of Pretext**……………………27

      **i.  Local 18's Non-Discriminatory Reasons for Terminating Reams' Employment**………………………………………...28

      **ii.  Reams Failed to Prove Pretext**………………………………29

         *a.  The $140.00 Discrepancy*………………………………31

         *b.  The Missing $2.57 in Petty Cash*………………………39

         *c.  History of Errors*………………………………………42

**CONCLUSION**…..………………………………………………………50

**CERTIFICATE OF COMPLIANCE**…………………………………………...51

**CERTIFICATE OF SERVICE**…………………………………………………51

**ADDENDUM: DESIGNATION OF DOCUMENTS**…………………………..52

# <u>TABLE OF AUTHORITIES</u>

## <u>Cases</u>

*Anderson v. Bright Horizons Children's Centers, LLC,* 2022 WL 910157, 2022-Ohio-1031……………………………………………………………………………22

*Azzam v. Baptist Healthcare Affiliates, Inc.,* 855 F.Supp.2d 653 (6th Cir. 2012)…...25

*Babb v. Maryville Anesthesiologist P.C.,* 942 F.3d 308 (6th Cir. 2019)………..46-47

*Belasco v. Warrensville Heights City School Dist.,* 634 Fed.Appx. 507 (6th Cir. 2015)……………………………………………………………………………42

*Bloomfield v. Whirlpool Corp.,* 984 F.Supp.2d 771 (N.D. Ohio 2013)………….…48

*Darby v. Childvine, Inc.,* 964 F.3d 307 (6th Cir. 2020)……………………………..26

*Deister v. Auto Club Ins. Ass'n,* 647 F. App'x 652 (6th Cir. 2016)…………….30, 34

*Ferrari v. Ford Motor Co.,* 826 F.3d 885 (6th Cir. 2016)………………22-23, 47-48

*Gamble v. JP Morgan Chase & Co.,* 689 F. App'x 397 (6th Cir. 2017)……...…27, 29

*Gooden v. City of Memphis Police Dept.,* 67 F. App'x 893 (6th Cir. 2003)………50

*Harrison v. Soave Enters. L.L.C.,* 826 F. App'x 517 (6th Cir. 2020)………………24

*Hendrick v. W. Reserve Care Sys.,* 355 F.3d 444 (6th Cir. 2004)………………30, 34

*Leary v. Fed. Express Corp.,* No. 21-5882, 2022 WL 19039658 (6th Cir. 2022)…...23

*Lockhart v. Marietta City Schs.,* 2020 WL 6782209 (S.D. Ohio)………………30-31

*Merendo v. Ohio Gastroenterology Grp., Inc.,* 2019 WL 955132 (S.D. Ohio)……..30

*Ogilbee v. Bd. of Education of Dayton Public Schs.,* 2010-Ohio-1913 (App. 2d Dist. 2010)……………………………………………………………………………24

*Sjostrand v. Ohio State Univ.,* 750 F.3d 596 (6th Cir. 2014)………………………..27

*Swanson v. Univ. of Cincinnati,* 268 F.3d 307 (6th Cir. 2001)……………………...25

*Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089 (1981)…...…………………………………………………………………………28

*Tinker v. Sears, Roebuck & Co.,* 127 F.3d 519 (6th Cir. 1997)…………………..…30

*Tri-Cites Holdings L.L.C. v. Tenn. Health Servs. & Dev. Agency,* 2017 WL 3687846 (E.D. Tenn.), *aff'd sub nom, Tri-Cites Holdings L.L.C. v. Tenn. Admin. Procedures Div.,* 726 F. App'x 298 (6th Cir. 2018)……………………………………27-28

*United States v. Heather Banhidy,* Case No.: 1:15-CR-00301-DAP……...…5 (fn. 1)

*United States v. Kristine Stephens,* Case No.: 3:12-CR-00119-MMD………5 (fn. 1)

*United States v. Monique Tyson,* Case No.: 4:17-CR-00027-JTM………...…5 (fn. 1)

*United States v. Stacy Johnson,* Case No.: 2:10-CR-00190-GMN-CWH...…5 (fn. 1)

*Whitfield v. Tennessee,* 639 F.3d 253 (6th Cir. 2011)………………..……22-23, 27

*Williams v. Graphic Packaging Int'l, Inc.,* 790 F. App'x 745 (6th Cir. 2019)….28-29

*Williams v. Holt,* 2006 WL 2290471 (E.D. Tenn.)…………………………………41

## **Statutes and Regulations**

29 U.S.C. § 401, *et seq*………………………………………………....3

29 C.F.R. §§ 401-459……………………………………………….………3

29 C.F.R. § 403.6……………………………………………………………...3

29 C.F.R. § 403.7……………………………………………………………...3

29 U.S.C. § 431…………………………………………………………3

29 U.S.C. § 432…………………………………………………………3

29 U.S.C. § 436…………………………………………………………3

29 U.S.C. § 436…………………………………………………………3

29 U.S.C. § 439…………………………………………………………3

42 U.S.C. § 12101, *et seq*………………………………….……22-24, 27

O.R.C. Chapter 4112, *et seq*……………………………………….……22-24, 27

## STATEMENT OPPOSING ORAL ARGUMENT

The salient facts and legal arguments presented in this case are fully recounted in the record and do not involve new or novel legal issues. Neither party seeks a change in the law, rather, both parties argue for the application of well-established law to well-pled facts, which are thoroughly presented in their respective briefs. Moreover, the facts and issues are not complicated as the Court need only decide whether the District Court correctly determined that Plaintiff-Appellant Heidi Reams ("Reams") failed to carry her burden to produce sufficient evidence to create a genuine issue of material fact. Because it would not substantially aid the Court in its determination, oral argument is not necessary in this case.

## STATEMENT OF JURISDICTION

Defendant-Appellee International Union of Operating Engineers, Local 18 ("Union" or "Local 18") agrees that the Court has jurisdiction to hear this appeal.

## STATEMENT OF ISSUES

Whether the District Court correctly determined that Plaintiff-Appellant Heidi Reams ("Reams") failed to carry her burden to produce sufficient evidence to create a genuine issue of material fact and sustain her claim of disability discrimination.

## STATEMENT OF THE CASE

### I.    INTRODUCTION

Appellant does not dispute her history of repeated accounting errors, nor does she dispute that she was repeatedly advised and counseled by her employer when these errors occurred. Appellant likewise readily admits that she failed to properly account for Union funds in the form of cash and that this error immediately precipitated her termination. What Appellant posits is that these unrefuted reasons for her termination are a pretext for disability discrimination. Unfortunately for the Appellant, her claims of pretext are based upon a strained interpretation of the relevant law and are unsupported by any actual evidence. Indeed, when applied to the correct legal standards, the facts of this case show that the District Court properly granted Local 18's Motion for Summary Judgment and dismissed Reams' claims in

full because they fail as a matter of fact and law. As such, and for the reasons set forth more fully below, this Court should affirm the District Court's rulings in their entirety.

## II.    RELEVANT FACTS

Local 18 is a labor organization that represents the interests of nearly 15,000 operating engineers working in Ohio and northern Kentucky. As the name implies, the vast majority of Local 18's membership is employed to operate heavy equipment including bulldozers, excavators, paving machines, and cranes.

Local 18 is led by its Business Manager who traditionally maintains an office in the Union's headquarters located in Cleveland, Ohio. (Reams Depo., RE 26-1, PageID # 357.)  The Union's Office Manager – with oversight responsibilities for the Union's clerical and accounting personnel – also works out of the Union's headquarters. (Id.)

In addition to its headquarters, the Union also maintains District Offices in the following cities: Cleveland, District 1; Toledo, District 2; Columbus, District 3; Middletown, District 4/5; Akron, District 6. (Reams Depo., RE 26-1, PageID # 357.) Each District Office is led by a District Representative and employs  Business Agents and Organizers that are responsible for negotiating, administering, and enforcing the

Union's collective bargaining agreement and servicing the membership in the field. (Id. at PageID # 357-358.)

Local 18 is subject to strict financial and accounting requirements dictated by the United States Department of Labor, Office of Labor-Management Standards ("OLMS") which enforces certain provisions of the Labor-Management Reporting and Disclosure Act ("LMRDA" or "Act"). *See* 29 U.S.C. § 401 et seq. (The Department of Labor's regulations that implement the LMRDA and that are enforced by OLMS are found in the Code of Federal Regulations at 29 CFR Parts 401-459.). The LMRDA mandates that Local 18 meet basic standards of fiscal responsibility and maintain financial records that are sufficient to permit its finances to be verified, explained, and checked for accuracy and completeness. 29 U.S.C. § 431(b).  This requires the Union's officers to maintain strict accounting records of all Union expenditures and income and to verify the same each year in an annual report filed with the DOL. 29 U.S.C. §§ 431(B), 432, 436; 29 CFR § 403.7. Indeed, under the LMRDA, the proper maintenance of Local 18's records and the accuracy of the reports submitted to the DOL is ultimately the personal responsibility of the Union's officers, in this case Local 18's Business Manager and President. 29 U.S.C. § 439(d); 29 CFR §§ 403.6 & 403.7.

To ensure compliance with LMRDA provisions, OLMS establishes best practices for documenting and authorizing expenditures. According to OLMS, the

proper documentation of financial transactions is a key element of the basic standards of fiscal responsibility required by the LMRDA. *See* OLMS Compliance Tip, Recordkeeping for and Reporting of Receipts, https://www.dol.gov/agencies/olms/compliance-assistance/tips/receipts. OLMS recommends that labor unions maintain a receipt recordkeeping system documenting all transactions including bills, sales invoices, dues, initiation fees, etc.. *Id*. The general purpose of the receipt recordkeeping rule is to ensure that Local 18 records the following basic information for any and all financial transactions: source of funds (employer, member, or vendor); amount received or disbursed; the purpose of each transaction (e.g. membership dues, initiation fee, rebate or rent payment); and the date the transaction occurred. *Id*. When cash is handled, LMRDA compliance requires a duplicate and numbered receipt to be issued with that clearly identifies the amount of the transaction, who the transaction was with, and what the transaction was for. *Id*. OLMS also recommends that internal controls in the form of various checks and balances to ensure proper handling of cash and other assets and minimize the possibility of theft or embezzlement. *See* OLMS Compliance Tip, Recordkeeping for and Reporting of Receipts, https://www.dol.gov/agencies/olms/compliance-assistance/tips/receipts. A primary control that OLMS recommends for cash handling is the segregation of duties so that different people are involved in handling and accounting all cash receipts. *Id*.

Significant consequences await unions that fail to adhere to the requirements contained in the LMRDA. At a minimum, OLMS conducts compliance audits that are designed to verify LMRDA compliance and investigate potential violations of the law. OLMS also conducts criminal investigations of alleged violations of the LMRDA including allegations involving the embezzlement of union funds and the willful failure to file and maintain complete and accurate financial records. These investigations often result in criminal and civil enforcement actions. [1]

In compliance with OLMS recommended best practices, Local 18 employs Office Clerks that are primarily responsible for handling the Union's financial transactions. (Reams Depo., RE 26-1, PageID # 359.) Working at a windowed front desk of each District Office, Local 18's Clerks must: accept and process dues payments, initiation fees, and other funds from Union members and applicants; sell the Union's promotional or "PEP" items such as clothing, hats and caps, hardhat stickers, etc.; maintain and account for the Union's petty cash fund; and prepare and send letters on behalf of the District Representative advising members of their dues obligations.  (Id. at PageID # 363-364.)

---

[1] *See e.g. United States v. Monique Tyson*, Case No.: 4:17-CR-00027-JTM; *United States v. Heather Banhidy*, Case No.: 1:15-CR-00301-DAP; *United States v. Kristine Stephens*, 3:12-CR-00119-MMD; *United States v. Stacy Johnson*, Case No.: 2:10-CR-00190-GMN-CWH**.**

Local 18 is a large union utilizing several different dues structures that vary depending upon calendar dates, the type of membership requested, and the "branch" or subdivision of the Union. (Reams Depo., RE 26-1, PageID # 360-361.) Clerks are therefore charged with the important responsibility of calculating the dues owed by each member.  This includes calculating and accounting for the type and amount of dues the Union requires from each member, when those dues must be paid, and the time period covered by those dues.  (Id. at PageID # 363.) This aspect of the Clerk's duties is especially sensitive as some Local 18 members – while excellent heavy equipment operators – struggle with literacy and mathematics and therefore rely upon the Clerks to accurately calculate their dues. (Id.)

Clerks use a Microsoft spreadsheet colloquially referred to as a "cash-sheet" to process and document all dues payments, initiation fees, and other membership related funds and financial transactions. (Clerk's Handbook, RE 26-6, PageID # 456-569; Reams Depo., RE 26-1, PageID # 358-359, 362.) The cash sheet documents the name of the member or applicant involved in the transaction, the date of the transaction, the type and purpose of the transaction (dues, fees, initiations, etc.), the period of time covered by the payment, the branch of the Union and/or type of membership, the receipt number assigned to the transaction, and the amount of the transaction and the types of funds (cash, check, or charge) transacted. (Reams Depo., RE 26-1, PageID # 362.) At the end of each day, the Clerk must total all the funds

received (cash, check, charge total) and ensure that the total matches what is reflected on the cash-sheet. (Id.)

Clerks also track the use of petty cash. (Reams Depo., RE 26-1, PageID # 364.)  Generally, each District Office keeps a maximum of $150.00 petty cash in a small cashbox. (Id.) Anytime petty cash is used, the Clerk is required to issue a receipt documenting the date, purpose, and amount of petty cash used.  (Id.)

Clerks track the Union's PEP inventory and transactions by maintaining a spread sheet that keeps a running inventory of all PEP items in-stock and sold.  As with other transactions, Clerks are required to issue numbered and duplicate receipts for all PEP transactions and to segregate these transactions from other Union funds. (Reams Depo., RE 26-1, PageID # 358-359, 364.)

Each night before leaving, the Clerk reconciles the cash-sheet by counting all funds received for the day and then balancing those funds against the receipts and cash sheet to ensure they all match. (Reams Depo., RE 26-1, PageID # 362.) Thereafter, the Union's Dispatcher will confirm that the total amount of funds presented by the Clerk matches both the total of the receipts and the total listed on the cash-sheet. (Roberts Depo., RE 26-7, PageID # 575.) Every Friday, at or around noon, the Clerk is required to close out the cash-sheet for the week. (Id. at PageID # 576-577.) To this end, the Clerk will check the total receipts for the week, the total

funds received for the week, and the total on the cash sheet to ensure that they each match. (Id.) The District Representative will confirm that the total of funds, receipts, and the cash-sheet all match and then travel to the bank to physically deposit the cash and checks into the Union's bank account. (Id.) The Clerk then mails the cash sheet, the receipts, the deposit slip, and the credit card total to the Union's Headquarters in Cleveland. (Id.) Clerical and accounting personnel at the Union's headquarters review the cash-sheet, the receipts, the deposit slip, the charge-machine totals, and the Union's bank balance to ensure that the Clerks have accurately calculated, applied, and recorded each transaction. (Reams Depo., RE 26-1, PageID # 362; Allen Depo., RE 26-8, PageID # 601-602.) If and when headquarters discovers an error, the Clerk is contacted, advised of the error, and asked to make the appropriate correction in red ink and resend the corrected cash-sheet. (Allen Depo., RE 26-8, PageID # 601-602.)

Reams was employed as a Clerk at the Local 18 District 2 Office and readily admits that her primary responsibility as a Clerk was handling the Union's financial transactions. (Reams Depo., RE 26-1, PageID # 359.) Reams also admits that Union members rely upon Clerks to calculate dues and generate dues notification letters which help determine whether or not a member is in good standing, whether they owe dues, and whether or not they are able to be initiated into Local 18. (Id. at

PageID # 363-364.)  Reams frequently failed to adequately or accurately perform her duties.

The Union's Office Manager - Kathy Allen - was responsible for overseeing all aspects of the Union's dues collection and was Reams' direct supervisor. (Allen Depo., RE 26-8, PageID # 600.) Kathy Allen testified that Appellant made frequent errors and headquarters personnel would document the errors and then contact Appellant and advise her of the errors so she could take appropriate remedial measures. (Id. at PageID # 602, 615.) For example, although she had been working as a clerk for nearly three years, in the months preceding her termination Appellant was still making repeated errors with regard to accounting and documenting transactions on her cash-sheet. (Id. at PageID # 615; Error Emails, RE 26-10, PageID # 714-726.)

The Business Representatives assigned to District 2 also experienced Plaintiff's work deficiencies. For example, Business Representative Ismael Gutierrez testified that Plaintiff frequently misplaced records related to dues and that this type of error detrimentally affected members. (Gutierrez Depo., RE 26-14, PageID # 1063.)  According to Mr. Gutierrez, by misplacing dues records, Plaintiff subjected members to potential expulsion from the Union or from a jobsite. (Id.)

The Union's highest officer, Business Manager Rick Dalton, was also aware of Plaintiff's historic work deficiencies and had several occasions to speak to her about her performance. As Mr. Dalton explained, prior to the "lost cash" event that led to her termination, Appellant frequently prepared documents containing typographical or other errors. (Dalton Depo., RE 26-15, PageID # 1079-1080.) On one occasion, Appellant misidentified a deceased member which nearly resulted in the misdirection of funds intended for a funeral donation. (Id.) Mr. Dalton also testified that Reams' cash sheets frequently contained clerical errors (Id. at PageID # 1093-1094) and that she made frequent errors in the dues notification letters she sent to District 2 members. (Id. at PageID # 1094.)

Despite the contentions in her Appellant Brief, the record demonstrates that Reams does not - and cannot - dispute making numerous errors in the performance of her duties. Indeed, during Reams' deposition, the Union presented her with documentation of no fewer than seventy-two (72) separate instances between April 28, 2017, and July 16, 2019, where the Union was alleging that Reams made errors in the dues notification letters she sent to Local 18 members. (Reams' Errors (1), RE 26-11, PageID # 727-881; Reams' Errors (2), RE 26-12, PageID # 882-1004; Reams Depo., RE 26-1, PageID # 371-372.) While Reams was able to identify four (4) instances where she challenged whether or not she made an error (Reams Depo., RE 26-1, PageID # 368, 370-371), it is undisputed – and Reams readily admits – that the

remaining sixty-eight (68) instances where she was alleged to have made clerical or

accounting errors are, in fact, documented performance errors on her part:

> Q.     All right. So just to summarize, if I could, you have had an
> opportunity to go through Exhibit B, and this is Bates-stamp
> numbers 285 through 561. And these represent instances where
> the Union is contending there was a documented instance of an
> error on your part as a clerk. And you have identified those that
> you content do not actually represent an error on your part,
> correct?
> A.     Correct.
> Q.     The other ones you have no basis to challenge whether or
> not that was actually an error on your part?
> A.     Correct.

(Reams Depo., RE 26-1, PageID # 371-372.) It is equally uncontested that errors in

the Clerk's dues notification letters carried serious ramifications for Local 18's

members. As Union District 2 Business Representative Ismael Gutierrez testified:

> Q.     And in terms of dues, if a member doesn't have their dues
> properly accounted for, does it detrimentally affect them?
> A.     Yes.
>      Q.     How does it detrimentally affect a member if their
> dues aren't properly accounted?
> A.     They can be suspended and they can lose their chance for
> life membership.
> Q.     Can they lose their work, then, too?
> A.     Yes.
> Q.     Can you pull a member off a job for not working?
> A.     Yes, I can.

(Gutierrez Depo., RE 26-14, PageID # 1063.)

In addition to the clerical errors in the dues notification letters she drafted, Reams also admits that she made errors as it relates to cash sheets. These errors included but are not limited to the following uncontested documented instances: December 10, 2018; January 8, 2019; March 21, 2019; April 12, 2019; April 17, 2019; April 25, 2019; and May 6, 2019. (Error Emails, RE 26-10, PageID # 714-726.) Indeed, the Union's Office Manager – Kathy Allen – offered uncontested testimony that Reams frequently made errors to her cash sheets which resulted in headquarters personnel contacting Reams and advising her of these errors and directing her to take appropriate remedial measures. (Allen Depo., RE 26-8, PageID # 602, 615.) Additionally, the Union's highest-ranking officer – Business Manager Richard Dalton – also testified that "Ms. Allen would contact me quite frequently throughout the period because Ms. Reams had a hard time doing the cash sheets and getting them correct. So virtually every week there were errors on her cash sheet." (Dalton Depo., RE 26-15, PageID # 1082.)

There is also no disputing that when Reams made clerical and accounting errors, Union managerial personnel contacted her, advised her of the errors, and asked her to avoid repeating them in the future. \ Mr. LaFaso testified in his deposition that his counseling involved face-to-face conversations about the errors committed. (LaFaso Depo., RE 26-13, PageID # 1008.) As it relates to documentation of the counseling, Mr. LaFaso testified that the hundreds of pages of

documents the Union presented regarding the errors to the dues notification letters

(See Reams' Errors (1), RE 26-11, PageID # 727-881; Reams' Errors (2), RE 26-12,

PageID # 882-1004) constitutes documentation of instances where Reams was

advised and counseled about a failure in her job performance and asked to improve:

> Q.    All right. Mr. LaFaso, then let me ask you the same
> questions I asked you before. So now for the calendar year of
> 2018, are you aware of any document that exists that was ever
> sent to or given to Ms. Reams documenting any type of
> performance-related discipline, warning or notice related to any
> alleged error that she made during that year?
> A.    Well, and I think this might go back to my previous
> statement from 2017. Right here are documents, these are all
> documents relating to an error of Ms. Reams. So I just want to
> make sure that 2017, yes, we had communications, we had
> documents stating about errors of Ms. Reams and correction
> thereof.

(LaFaso Depo., RE 26-13, PageID # 1027-1028.) This was further clarified in the

Errata Sheet addressing Mr. LaFaso's deposition testimony where he addressed the

Clerk's dues notification letters which were identified as "Exhibit B" during his

deposition:

> Q.    - are you aware of any written disciplinary action that Ms.
> Reams was assessed by you or anyone else at Local 18?
> A.    No, other than the written documentation of her errors
> which are in Exhibit B.
>                *** 
> Q.    Any written documents where - - I will break it up into two
> things. Any written documents to Ms. Reams where she was
> warned or counseled or put on notice about any type of poor
> performance related to any alleged errors that she had made
> throughout the entirety of that year?

> A.    No, other than the written documentation of her errors which are in Exhibit B.
>
> ***
>
> Q.    And I want to make sure that we are on the same page here. I am not asking about whether you contend that you verbally talked to her about this. I am asking for written documentation that would show me that she was ever warned during 2017 or advised of any errors or given a warning or any notice about her performance?
>
> A.    No, other than the written documentation of her errors which are in Exhibit B.
>
> ***
>
> Q.    So my question, again, if: For the calendar year of 2017, are you aware of any written documents or communications, electronic or physical, between you and anyone where Ms. Reams' performance or any performance discipline was ever discussed?
>
> A.    No, other than the written documentation of her errors which are in Exhibit B.

(LaFaso Depo., RE 26-13, PageID # 1026, 1051-1058.) Similarly, Mr. Dalton

expressed his knowledge of the frequency of Reams' errors with regard to the Clerk's

dues notification letters and how Mr. LaFaso was instructed to personally confer

with and counsel Reams on these errors:

> Q.    So looking at the same period, so roughly, say, about mid-2016 to, you know, just before August of 2019, were there any occasions where Mr. LaFaso, or whoever the district rep was, came to you directly seeking or asking for some type of disciplinary action against Heidi Reams?
>
> A.    No. Brett would merely all and say he was having some issues with her, maybe typing, or whatever, and I said, "Well, get with her and handle it."

(Dalton Depo., RE 26-15, PageID # 1081-1082.)

In addition to, Reams herself admitted that the hundreds of Clerk's dues notification letters presented to her at her deposition (Reams' Errors (1), RE 26-11, PageID # 727-881; Reams' Errors (2), RE 26-12, PageID # 882-1004) constitutes documentation of errors in her work performance. (Reams Depo., RE 26-1, PageID # 367-368.) Indeed, although Reams claims that she was unaware of the number of errors, she does not dispute making those errors:

> Q.    You would agree with me that we just spent about an hour having      you review Defendant's Exhibit B, correct?
> A.    Correct.
> Q.    You would agree that is hundreds of pages of instances where there were documented errors on your part, correct?
> A.    I was unaware of the compile.
>                    ***
> Q.    And that those errors included overcharging members, charging members more money than we are legally allowed to charge them for their dues?
> A.    Correct.
> Q.    And that included failing to account properly for money that members gave to you?
> A.    Correct.

(Reams Depo., RE 26-1, PageID # 377.) Therefore, it is undisputed that Reams frequently made errors with regard to the Clerk's dues notification letters, there is documentation and admissions from Reams herself that she did in fact commit those errors, and there is uncontroverted evidence and testimony that Reams was counseled by several managerial personnel regarding these errors.

15

The same is true as it relates to Reams' history of errors in the cash sheet. Ms. Allen testified regarding communications being sent to Reams about mistakes and errors that she made, the importance of those errors, and how those errors are not acceptable. (Allen Depo., RE 26-8, PageID # 614-615.) Additionally, Ms. Allen testified that when errors in cash sheets were brought to Reams' attention, Reams did not dispute her responsibility for those errors. (Id. at PageID # 615.) Additionally, Mr. Dalton testified that Reams made frequent errors on her cash sheets. (Dalton Depo., RE 26-15, PageID # 1081-1082.) Reams' co-worker, Ms. Kim Roberts, also testified that she counseled Reams on cash-sheet errors. (Roberts Depo., RE 26-7, PageID # 580.) Therefore, it is again undisputed that Reams has a history of errors while performing her cash sheet duties, there is documentation and admissions from Reams that she did in fact commit these cash sheet errors, and it is undisputed that Reams was counseled by several officers of Local 18 regarding these cash sheet errors.

It is uncontested that Reams left work early on July 26, 2019, and left behind accounting and clerical discrepancies including unaccounted/missing funds and errors in inventory. After leaving work early, Reams went to a chiropractor appointment and suffered an injury to her neck. (Reams Depo., RE 26-1, PageID # 372.) Reams admits that after her injury she was not able to return to work and Local 18 discovered that one-hundred and forty dollars ($140.00) was not accounted for

on the cash sheet. (Id. at PageID # 375.) Reams admits that while she was home from work due to her injury, the Union also learned that the petty cash fund was missing forty-two dollars and fifty-seven cents ($42.57) (Id.) Lastly, Reams admits that, due to her absence, the Union discovered that her PEP fund inventory failed to account for one (1) beanie and one (1) hoodie. (Id.)

While Reams is correct that she told the Union dispatcher when left work early on July 26, 2019, that there was a discrepancy with the cash sheet (Appellant Brief, RE 15, PageID # 12) – meaning Reams, yet again, admitted another error– Reams only stated that there was a discrepancy and does not claim that she gave any explanation for the cash sheet discrepancy. More importantly, Reams did not tell the dispatcher that, on top of the cash sheet discrepancy, that the petty cash fund was off as well. Instead, on Monday, July 29, 2019, while covering for Reams during her absence, the Union's Dispatcher discovered the cash sheet that Reams told her about and the missing funds from the petty cash fund and missing inventory from the PEP. (Roberts Depo., RE 26-7, PageID # 582.) Ms. Roberts then notified Mr. LaFaso of Reams' accounting errors, and an investigation ensued. (Id.; LaFaso Depo., RE 26-13, PageID # 1010.) Mr. LaFaso then contacted his supervisor, Union Business Manager Richard Dalton, because missing money is a "pretty huge deal". (LaFaso Depo., RE 26-13, PageID # 1010.) Mr. LaFaso relayed to Mr. Dalton that: (1) there was additional cash that was not accounted for on the cash sheet; (2) money was

missing from the petty cash fund; and (3) the PEP inventory was off. (Dalton Depo., RE 26-15, PageID # 1084-1087.) Mr. Dalton then directed Mr. LaFaso and Ms. Roberts to contact all the members that were in the District Office the previous Friday and see if any reported missing money. (Id. at PageID # 1084.) Mr. Dalton also asked the pair to confirm the amount that was missing from petty cash and the PEP inventory. (Id. at PageID # 1086.) Mr. Dalton also instructed Mr. LaFaso to call Ms. Reams and see if she could explain the discrepancies. (Id. at PageID # 1085.)

Mr. LaFaso contacted Reams while she was out of work, attempting to ascertain how these accounting errors occurred and how to rectify those errors. (Reams Depo., RE 26-1, PageID # 374.) Reams told Mr. LaFaso, without the information in front of her, Reams could not explain how any of the errors occurred. (Id.) Mr. LaFaso and Ms. Roberts contacted every Union member who came in the District Office the previous Friday and none indicated that they were missing any cash or receipts. (LaFaso Depo., RE 26-13, PageID # 1034.) Mr. Dalton then assigned Local 18 Special Representative Michael Bertolone to investigate the matter. (Bertolone Email, RE 26-17, PageID # 1112-1114.)

Mr. Bertolone met with Ms. Reams on August 19 when she returned to work and asked her to provide an explanation for the missing and unaccounted funds. (Bertolone Email, RE 26-17, PageID # 1112-1114.) Reams asserts in her Brief that at this meeting, she was able to explain that Union member Mr. Cormier was the

individual who overpaid on July 26, 2019. (Appellant Brief, RE 15, PageID # 15.)
This is a complete misstatement of the facts in this case. While Reams did state that
Mr. Cormier was the individual who overpaid, during Mr. LaFaso's and Ms. Robert's
investigation, they called Mr. Cormier and he stated that he did not overpay and was
not missing any money. (LaFaso Depo., RE 26-13, PageID # 1014-1015, 1051-
1058.) As to the missing $42.57 in petty cash, Reams hypothesized that $40 of that
was due to the simple error of her putting the money in the wrong place. (Appellant
Brief, RE 15, PageID # 15.) Finally, as to the $2.57 still missing from the petty cash,
Reams admits that "[t]here is no way to account for the $2.57." (Reams Depo., RE
26-1, PageID # 376.)

Given that Reams could not give adequate explanations as to the $100
discrepancy on the cash sheet and the $2.57 missing from the petty cash, the next
morning, on August 20, 2019, Reams was summoned to another meeting with Mr.
Dalton, Mr. Bertolone and Mr. LaFaso. (Dalton Depo., RE 26-15, PageID # 1078.)
During this meeting, Reams admitted to making serious errors in the performance of
her duties as a Union Clerk, as Mr. Dalton stated:

> A.    *** She told me that she took cash from a member, did not
> count it, put it in an envelope. He came back, she got another
> $100 from the member, she wrote him a receipt and gave him
> change. I asked her, "How could you give him a receipt and give
> him change if you don't know how much he gave you all
> together?" She said, "Well, I assumed he gave me the right
> amount." And I said, "But you just told me you took some

money, put it in an envelope, he left, he came back, gave you more money, and you never counted it. Did you count it or not?" And she said, "No, I did not count it." I said, "So you don't know how much money you got from him, but you have him $15 and something in change." I said, "How do you do that? The policy is in this office you count the money and you write your receipt in hand." "Well, I was busy, apparently, and I didn't do that."

(Dalton Depo., RE 26-15, PageID # 1091.) Thus, with Reams' history of errors on her dues notification letters and cash sheets, the cardinal infractions of her duties for which Reams could not adequately explain were "the straw that broke the camel's back". (Id. at PageID # 1093; Allen Depo., RE 26-8, PageID # 610, 615.) Thus, because of Reams' failures and inadequate job performance on July 26, 2019, and because of Reams' vast number of prior clerical and accounting errors in her short time as a Clerk, Reams' employment was terminated. (Dalton Depo., RE 26-15, PageID # 1091-1092.)

## III.   PROCEDURAL HISTORY

Reams filed her Complaint against Local 18 on April 27, 2021. Reams filed her Second Amended Complaint on July 23, 2021. (Second Amended Complaint, RE 12, PageID # 133-146.) Local 18 filed its Motion for Summary Judgment, which was granted by the District Court on February 23, 2023, as a final appealable order. (Opinion, RE 30, PageID # 1946-1970.) Reams timely appealed on March 21, 2023. (Notice of Appeal, RE 32, PageID # 1972.) Specifically, Reams appeals to the Sixth

Circuit Court of appeals to reverse the granting of summary judgment as to Counts I and II of her Second Amended Complaint.

## <u>SUMMRAY OF ARGUMENT</u>

Reams has failed to establish that she was disabled. There is no evidence indicating that Reams' injury substantially limits one or more of her major life activities. Even if Reams could point to evidence establishing her disability, the Union still had a legitimate non-discriminatory reason for terminating her employment and Reams cannot carry her burden and present evidence that this legitimate non-discriminatory reason was a pretext for disability discrimination. As the District Court correctly found, Reams failed to produce even a scintilla of evidence in support of her burden and, instead, relies on naked and baseless assertions as her "evidence" of pretext. Because Reams failed to produce sufficient evidence to create a genuine issue of material fact as it pertains to pretext, Local 18 respectfully requests that this Honorable Court affirm the District Court's order granting of summary judgment in favor of the Union.

## <u>ARGUMENT</u>

I.  **THE DISTRICT COURT DID NOT ERROR IN GRANTING SUMMARY JUDGMENT AS TO REAMS' DISABILITY DISCRIMINATION CLAIMS**

A. <u>Reams Failed to Meet Her *Prima Facie* Case</u>

21

In arguing her case on appeal, Reams states the wrong formulation of elements for establishing a *prima facie* case of disability discrimination. Reams states in her Principal Brief that a plaintiff establishes a *prima facie* case of disability discrimination under both the ADA and R.C. § 4112.02 where, "(1) the employee is disabled or perceived her as disable by the employer, (2) the employer took adverse employment action, at least in part, because the employee is disabled or otherwise treated the disabled employee differently than similarly-situated non-disabled employees, and (3) the employee, though disabled, can safely and substantially perform the job's essential functions, with or without reasonable accommodation. *Hood v. Diamond Products, Inc.,* 74 Ohio St.3d 298, 1996-Ohio-259, 658 N.E.2d 738." (Appellant Brief, RE 15, PageID #17-18.) These elements, however, are not those used in the context of establishing a ***prima facie case***, but rather elements that a plaintiff must prove to ***recover*** for disability discrimination under both R.C. 4112.02 and the ADA. *Anderson v. Bright Horizons Children's Centers, LLC,* 2022 WL 910157, 2022-Ohio-1031, ¶ 48, citing *Whitfield v. Tennessee,* 639 F.3d 253, 259 (6th Cir. 2011) (a prima facie test like the one articulated in *Hood* "makes little sense, as [it includes an element requiring proof that the employee was discharged because of a disability, which] requires at the *prima facie* stage what the *McDonnell Douglas* burden-shifting framework seeks to uncover only through two additional burden shifts, thereby rendering that framework wholly unnecessary"); accord *Ferrari v.*

*Ford Motor Co.,* 826 F.3d 885, 894 (6th Cir. 2016), fn. 4 (quoting and following *Whitfield*).

Instead, as the Sixth Circuit has stated time and again, to establish a *prima facie* case of disability discrimination through indirect evidence, a plaintiff must show that "(1) she is disabled; (2) she is otherwise qualified for the position, with or without reasonable accommodation; (3) she suffered an adverse employment decision; (4) the employer knew or had reason to know of her disability; and (5) the position remained open while the employer sought other applicants or the employee was replaced." *Leary v. Fed. Express Corp.,* No. 21-5882, 2022 WL 19039658 (6th Cir. Dec. 20, 2022), citing *Whitfield,* 639 F.3d at 258-59 (6th Cir. 2011). Indeed, Reams relies on this five-element formulation of establishing a *prima facie* case when opposing Local 18's Motion for Summary Judgment (Reams' Memorandum in Opposition, RE 27, PageID #1141), and Reams' attempt at using such an archaic and perplexing formula is yet another attempt to create a genuine issue of material fact that is clearly not present.

In the context of the correct five-element formulation of a *prima facie* case, Reams is correct in her assertion that Local 18 disputes only the first element, that Reams is considered disabled under the ADA. (Appellant Brief, RE 15, PageID #18.) Under both the ADA and R.C. § 4112.01(A)(13), disabled means having or being perceived as having "a physical or mental impairment that substantially limits one

23

or more major life activities." Under both the ADA and R.C. § 4112.01(A)(13), courts apply a three-step test to determine whether the condition identified by the plaintiff constitutes a disability protected by law. Under this tri-partite standard, a plaintiff will be deemed to be disabled if she has 1) "a physical or mental impairment that substantially limits one or more major life activities of such individual"; 2) "a record of such an impairment"; or 3) "being regarded as having such an impairment." *Ogilbee v. Bd. of Education of Dayton Public Schs.,* 2010-Ohio-1913, ¶ 23 (App. 2d Dist. 2010), *citing,* 42 U.S.C. § 12102(1).

In this matter, Reams relies on the first prong, having a physical or mental impairment that substantially limits one or more major life activities, to show that she is disabled within the meaning of the ADA and R.C. § 4112.01(A)(13). (Appellant Brief, RE 15, PageID # 26.)  To prove that she is "actually disabled" under § 12102(1)(A), Reams must show "a physical or mental impairment that substantially limits one or more life activities." *Harrison v. Soave Enters. L.L.C.,* 826 F. App'x 517, 523 (6th Cir. 2020) (internal quotations omitted). Reams alleges that the "physical impairment" she suffered from is a torn carotid artery that caused a seventy percent (70%) blockage in that artery which forced her to take a blood-thinner for five (5) months to reduce the chance of having a stroke. (Appellant Brief, RE 15, PageID # 24.) While Reams argues that this Court must analyze her condition as it existed during her employment, between July 26, 2019 (the date in which the

condition arose) and her termination on August 20, 2019 (Appellant Brief, RE 15, PageID # 26-27), Reams fails to cite to any precedent establishing this rule. This is because, in reality, "the relevant time for assessing the existence of a disability is the time of the adverse employment action." *Azzam v. Baptist Healthcare Affiliates, Inc.,* 855 F. Supp. 2d 653, 658 (6th Cir. 2012), citing *Swanson v. Univ. of Cincinnati,* 268 F.3d 307, 316 (6th Cir. 2001).

In this case, Reams returned to work on August 19, 2019, and the Union was not made aware of any disability Reams was suffering from, or any restrictions Reams was under. Reams confirmed this in her deposition:

> Q.    And you were able to return to work as your job as clerk, correct?
> A.    Correct.
> Q.    And you had no restrictions on your ability to perform your job as a clerk on August 19th when you returned, correct?
> A.    I believe I had put in for a request for a headset. That was my only request, just so my neck wasn't to one side or the other.
> Q.    Do you recall when you made that request?
> A.    As soon as I got back.
> Q.    So the day you got back?
> A.    Yes.
> Q.    And that was the only request for an accommodation you made?
> A.    That was the only one.

(Reams Depo., RE 26-1, PageID # 373-374.) Similarly, as it relates to Reams' life activities, she testified as follows:

> Q.    Was there anything that your – anything in life that you are unable to do as a result of that injury, once you returned to work, you returned to work with Local 18, was there any aspect - - you already said there was no part of your job that you couldn't perform because of that injury?
>
> A.    Right.
>
> Q.    Was there any other thing in life, any life activity that you were unable to do anymore because of that injury?
>
> A.    I was recommended I can't see a chiropractor ever.
>
>                    ***
>
> A.    I can't see a masseuse, ever. And I was recommended not to have children.
>
> Q.    But in terms – no one said, "Hey, you can't sit, you couldn't sit this way, you can't stand that way, you shouldn't walk this way"?
>
> A.    The only stipulation that they had given me is if – I shouldn't – I shouldn't go on roller coasters, anything that holds or jerks my neck.
>
> Q.    But you can still eat the same, sleep the same?
>
> A.    Yes.
>
> Q.    Drive your car the same, walk the same, sit the same, write the same?
>
> A.    Correct.

(Reams Depo., RE 26-1, PageID # 375.) At best, Reams alleges that her condition *could* cause her to have a seizure. However, as stated in *Darby v. Childvine, Inc.,* "to qualify as a disability *** a condition must substantially limit a major life activity, not merely have the potential to cause conditions that do." *Darby,* 964 F.3d 440, 446 (6th Cir. 2020). Here, there is no evidence indicating that Reams' injury substantially limits one or more of her major life activities. Reams herself testified that although she suffered from a partially blocked artery that could cause a stroke at any minute, that condition did not prevent her from doing any part of her job as a Clerk. (Id. at

PageID # 374.) As such, Reams failed to produce sufficient evidence establishing that her injury substantially limited a major life activity to qualify her as disabled under the ADA or R.C. § 4112.01(A)(13). Therefore, Reams failed to satisfy the first prong of her *prima facie* case.

### B.    Reams Failed to Produce Evidence of Pretext

Regardless of whether Reams' torn carotid artery actually constitutes a "disability" under the ADA and R.C. § 4112.01(A)(13), Appellant's disability discrimination claims still fail as a matter of law because Reams failed to produce sufficient, if any, evidence of pretext. Under the *McDonnell Douglas* burden-shifting framework, if a plaintiff establishes a *prima facie* case of disability discrimination, the burden shifts to the defendant to articulate a non-discriminatory explanation for the employment action, and if the defendant does so, the burden shifts back to the plaintiff to prove that the defendant's explanation is pretextual. *Gamble v. JP Morgan Chase & Co.,* 689 F. App'x 397, 401 (6th Cir. 2017) (citing *Whitfield v. Tennessee,* 639 F.3d 253, 259 (6th Cir. 2011)). An employer's burden to set forth one or more legitimate, non-discriminatory reasons for terminating an employee is one of production, not persuasion. *Sjostrand v. Ohio State Univ.,* 750 F.3d 596, 599 (6th Cir. 2014). That is, Local 18 must simply explain what it has done and produce evidence of legitimate non-discriminatory reasons for its actions. *Tri-Cites Holdings L.L.C. v. Tenn. Health Servs. & Dev. Agency,* 2017 WL 3687846, at *15 (E.D. Tenn.), *aff'd*

*sub nom, Tri-Cities Holdings L.L.C. v. Tenn. Admin. Procedures Div.,* 726 F. App'x 298 (6th Cir. 2018) (internal quotation marks omitted) (quoting *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089 (1981)).

### i.    Local 18's Non-Discriminatory Reasons for Terminating Reams' Employment

Local 18 produced a plethora of irrefutable evidence establishing legitimate, non-discriminatory reasons for Reams' termination, being Reams' long history of clerical and accounting errors coupled with the improper accounting of Union funds in the weeks leading up to her termination. (Dalton Depo., RE 26-15, PageID # 1093, 1098.) As to the evidence supporting these reasons, Kathy Allen, Reams' supervisor, testified that Reams did not dispute she made work related errors when the issue was brought to her attention. (Allen Depo, RE 26-8, PageID # 614-615.) Additionally, Local 18 produced hundreds of pages of documents evidencing Reams' poor performance history. (Reams' Errors (1), RE 26-11, PageID # 727-881; Reams' Errors (2), RE 26-12, PageID # 882-1004.) Furthermore, the Union's highest ranking officer - Business Manager Richard Dalton - testified that Reams often emailed incomplete data and sent cover sheets with incorrect dates, and further described Reams' typing as "terrible" and said her "emails were bad". (Dalton Depo., RE 26-15, PageID # 1079-1080.) Local 18 also introduced the testimony of Ismael Gutierrez, a business representative for the Union, who stated that Reams had failed

to account weeks for members' service dues. (Gutierrez Depo., RE 26-14, PageID #1063.) According to Mr. Gutierrez, by misplacing dues records, Plaintiff subjected members to potential expulsion from the Union or from a jobsite. (Id.)

At the time of her discharge, Reams herself conceded that Local 18 articulated a legitimate, non-discriminatory reason for terminating Reams' employment, being: (1) her history of frequent clerical and accounting errors to the dues notification letters and cash sheets; and (2) the infractions from July 26, 2019, which led to unaccounted for and missing funds. (Dalton Depo., RE 26-15, PageID # 1093, 1098.) Reams likewise does not deny that she accumulated "hundreds of pages" of documented errors over the course of three and a half years which include overcharging members and failing to account properly for the money members gave her. (Reams Depo., RE 26-1, PageID # 377.) Therefore, Local 18 has sufficiently articulated a non-discriminatory explanation for terminating Reams' employment. *See Gamble,* 689 F. App'x at 401. The burden therefore shifts back to Reams to prove the Union's explanation is pretextual. *Id.*

### ii.    Reams Failed to Prove Pretext

In this case, there are three (3) methods Reams can use to show pretext. First, she can offer evidence that there is no basis in fact for Local 18's proffered reason. To succeed under this theory, she must establish that the conduct warranting her

termination "never happened, i.e., that [it] [is] actually false." *Williams v. Graphic Packaging Int'l, Inc.,* 790 F. App'x 745, 751 (6th Cir. 2019). Second, Reams may produce circumstantial evidence showing that Local 18's proffered reasons did not actually motivate their decision to terminate her. *Deister v. Auto Club Ins. Ass'n,* 647 F. App'x 652, 656 (6th Cir. 2016). For example, "inconsistent or contradictory statements from [Local 18] could cast doubt on [their] motivation, giving rise to an inference of pretext." *Merendo v. Ohio Gastroenterology Grp., Inc.,* 2019 WL 955132, at *12 (S.D. Ohio) (citing *Tinker v. Sears, Roebuck & Co.,* 127 F.3d 519, 523 (6th Cir. 1997)). At best, "the sheer weight of [this evidence]" must "make[] it more likely than not" that the Union's explanation "is a pretext, or a coverup." *Hendrick v. W. Reserve Care Sys.,* 355 F.3d 444, 460 (6th Cir. 2004) (quotation marks omitted). Third, Reams may offer evidence showing that Local 18's proffered reasons were insufficient to warrant her termination. *Hendrick,* 355 F.3d at 460. This "ordinarily, consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Id.* (citation omitted).

Regardless of which method for proving pretext Reams uses, a reasonable jury must be able to conclude by a preponderance of the evidence that her disability was a "but for cause" of her termination. *Lockhart v. Marietta City Schs.,* 2020 WL

6782209, at *13 (S.D. Ohio). Here, Reams argues she can show pretext by utilizing the second and third methods of showing pretext, that Local 18's proffered explanation did not actually motivate Reams' termination, and that Local 18's proffered explanation was otherwise insufficient to warrant termination (Appellant Brief, RE 15, PageID # 33.) However, Reams then attempts to show pretext using the first method. (Appellant Brief, RE 15, PageID # 34.) Regardless of the way the arguments are identified and argued, as best as the Union can decipher, it appears that Reams asserts she can establish pretext under all three theories. Accordingly, to simplify the pretext analysis, Local 18 will address each of Local 18's proffered reasons for terminating Reams in turn.

### a.    The $140.00 Discrepancy

As to the $140.00 discrepancy on her cash sheet, Reams argues that she can prove this reason is pretext under the first theory, that there is no basis in fact for the discrepancy. (Appellant Brief, RE 15, PageID # 34.) This entails producing evidence establishing that the $140 discrepancy "never happened, i.e., that [it] [is] actually false." *Williams,* 790 F. App'x at 751. Reams begins by stating that Kimberly Roberts testified that the discrepancy was $300, not $140. (Appellant Brief, RE 15, PageID # 34.) While it is true that Ms. Roberts testified as such (Roberts Depo., RE 26-7, PageID # 582), Ms. Roberts was deposed on May 25, 2022, two years and nine months after Reams was terminated. (Id. at PageID # 570.) As Ms. Roberts stated in

her deposition, time could have affected her ability to recall the precise amount that the cash sheets were off by. (Id. at PageID # 586.)

Furthermore, Reams' reliance on Ms. Roberts' testimony is mistaken because Ms. Roberts was not one of Reams' supervisors, and Ms. Roberts testified that she never even had any direct communication with Reams about this discrepancy. (Roberts Depo., RE 26-7, PageID # 582.) Reams states that after Ms. Roberts stated the over was $300, "then the allegation became that the overage was $140", citing an email between Reams' supervisors around the time of Reams' termination. (Appellant Brief, RE 15, PageID # 34.) Thus, despite Ms. Roberts' testimony almost three years after Reams' termination, around the time of her termination, Local 18's allegation was in fact that the discrepancy was $140.00. (Bertolone Email, RE 26-17, PageID # 1112-1114.)

Reams goes on to argue that the $140.00 overage has no basis in fact because, "$40 of that amount was actually petty cash that was accounted for, but was simply placed in the wrong bag on Reams' desk." (Appellant Brief, RE 15, PageID # 34.) This is yet another attempt by Reams to leave out key pieces of facts in order to survive summary judgment. First, the $140.00 discrepancy has a basis in fact, as there was, in fact, a $140.00 overage and Reams admitted that there was such a discrepancy. (Reams Depo., RE 26-1, PageID # 377.) Second, to state that $40 of the $140 "was simply placed in the wrong bag on Reams' desk" is at best supposition

by Reams and, at worst, a clear misstatement of the facts. For example, in the Summary of Pertinent Facts section of her Brief Appellant argues that the $40 was "petty cash that Reams had mistakenly put in the 'red bag' instead of in the petty cash box." (Appellant Brief, RE 15, PageID # 15.) This statement, however, is merely Appellants own speculation and other than her own conjecture, there is no actual evidence that that the $40 was "petty cash that Reams had mistakenly put in the 'red bag' instead of in the petty cash box." Moreover, even if credited, Reams explanation is still an admission she made a legitimate error and put money in the wrong place. As such, be her own admissions, Appellant concedes there is a basis in fact for the discrepancy on the cash sheet.

Reams subsequent claims that the $140.00 coverage has no basis in fact, because the error was a simple error (Appellant Brief, RE 15, PageID # 34) makes no sense. Indeed, while Reams argues in her brief that she "did not testify that this allegation was 'legitimate,'" her brief then goes on to state "she admitted the truth, that there was a discrepancy…" (Appellant Brief, RE 15, PageID # 36.) While Reams argues that this discrepancy was "simply giving him back the wrong amount of change" (Appellant Brief, RE 15, PageID # 34), when questioned about this error by the Union's Business Manager, Reams conceded that she did not even count the money the member gave her, thus failing at the main function of her job as a Clerk. (Dalton Depo., RE 26-15, PageID # 1091-1092.) Indeed, Mr. Dalton testified that he

asked Reams, "[w]hen has it even been the policy you take money and you don't count it?" to which Reams replied, "It is not." (Id. at PageID # 1092.) Thus, this error was not a simple one, as Reams claims, but a cardinal infraction of her duties as a Union Clerk.

Put simply, Reams' arguments that there is no basis in fact for the $140.00 discrepancy are belied by the record and by her own statements. Indeed, Reams completely failed to produce any evidence establishing that the $140 discrepancy "never happened, i.e., that [it] [is] actually false." *Williams,* 790 F. App'x at 751. Because Reams failed to produce any evidence proving that the $140 error on her cash sheet has no basis in fact, she has failed to carry her burden and the District Court did not err in entering summary judgment on the Union's behalf.

Under the second method of proving pretext, Reams can show pretext by producing circumstantial evidence that Local 18's proffered reasons did not actually motivate their decision to terminate her. *Deister,* 647 F. App'x at 656. This includes evidence of a "sheer weight" that makes it more likely than not that the Union's explanation "is a pretext, or a coverup." *Hendrick,* 355 F.3d at 460. (quotation marks omitted). Here, Reams argues that she explained that the $100 overage was from a Union member, named Mr. Cormier, overpaying. (Appellant Brief, RE 15, PageID # 34.) The "circumstantial evidence" Reams argues proves pretext under this theory is that "Appellee never refunded him the money[,]" nor refunded the money to

anyone. (Id. at PageID # 35.) Reams' argument, however, is completely speculative, as she has produced absolutely no evidence to support it. Indeed, the $100 overage was never linked to Mr. Cormier, as clarified by Mr. LaFaso's Errata Sheet:

> Q.    And what was determined was that there was one issue with, potentially, a member who overpaid on dues by about $100, right?
> A.    That is correct, Ms. Reams claimed that the extra $100.00 could be the result of a member named Micha Cormier overpaying. But we checked with Mr. Cormier and he said he did not overpay and was not missing $100.00.

(LaFaso Depo., RE 26-13, PageID # 1014, 1051-1058.) Mr. LaFaso again reiterated this fact further on in his deposition, as clarified by his Errata Sheet:

> Q.    Now, prior to this or after this meeting with Ms. Reams, did you have any direct communications with Mr. Cormier to talk about this specific incident?
> A.    Yes. We contacted all the members who came in on Friday, including Mr. Cormier, and asked whether they were missing any money. No one said they were missing any money including Mr. Cormier.
> Q.    Are you aware of whether anyone at the District 2 office or headquarters talked directly to Mr. Cormier to find out whether he, indeed, remembers overpaying or underpaying or paying what he had to pay to Ms. Reams for those dues?
> A.    Yes. I contacted all the members who came in on Friday, including Mr. Cormier, and asked whether they were missing any money. No one said they were missing any money including Mr. Cormier.

(LaFaso Depo., RE 26-13, PageID # 1015, 1051-1058.) Mr. Dalton further testified that because no member came forward to claim overpayment, Mr. Dalton instructed

35

the Union to "put the $100 into the Christmas basket fund for the membership for

that district." (Dalton Depo., RE 26-15, PageID # 1094.)

Reams argues further that the $100 discrepancy could not have motivated her

termination because it was not any different from any past overage issue Reams

made during her employment. (Appellant Brief, RE 15, PageID # 35.) This argument

does not encapsulate the significance of her errors, as explained by Mr. Dalton:

> A.      ***She told me that she took cash from a member, did not
> count it, put it in an envelope. He came back, she got another
> $100 from the member, she wrote him a receipt and gave him
> change. I asked her, "How could you give him a receipt and give
> him change if you don't know how much he gave you all
> together?" She said, "Well, I assumed he gave me the right
> amount." And I said, "But you just told me you took some
> money, put it in an envelope, he left, he came back, gave you
> more money, and you never counted it. Did you count it or not?"
> And she said, "No, I did not count it." I said, "So you don't know
> how much money you got from him, but you gave him $15 and
> something in change." I said, "How do you do that? The policy
> is in this office you count the money and you write your receipt
> in hand." "Well, I was busy, apparently, and I didn't do that."

(Dalton Depo., RE 26-15, PageID # 1091.) Indeed, this type of overage error was

not the same type of error Reams frequently made. In regard to these overage errors,

Reams testified as follows:

> In terms of the dues-collection process, one of the chief problems
> that I often encountered was the situation when a member
> decided to pay dues beyond the required period. When members
> would do this, it often led to an error on a dues letter that I would

> send out to the member instructing them on the amount of dues
> owed for that period.

(Reams Declaration, RE 27-1, PageID #1158.) Thus, it is clear that this error was
not the same type of error Reams admitted she frequently made, errors on a dues
notification letters, but instead, this was Reams failing to count money and giving
change to a member without knowing how much the member paid. Indeed, the
significance of this error was reiterated by Mr. Dalton during his deposition wherein
he testified:

> Q.    Had Ms. Reams had any issues in the past dating back to
> 2016 where her cash was ever off or needed to be corrected or
> there was any type of imbalance that had to be rectified?
>               ***
> A.    I am not aware of any cash being off or anything. I am only
> aware of the cash sheets not being done properly. This is the first
> time I had heard the cash was off.
> Q.    And what is the difference? If the cash sheet is off, how is
> that not a cash being off problem? Explain your explanation of
> the difference.
>               ***
> A.    The cash sheets would be, basically, clerical errors. It
> might be a wrong receipt number, a wrong social security number
> on a person, the amount is put in the wrong column. Instead of
> "Dues," it might by under "Assessments," or vice versa. There
> probably wasn't a week gone by where she didn't have a social
> security number wrong, wrong receipts. I mean, I reviewed,
> while she was off, some of her cash sheets from the two or three
> years prior. There were maybe a handful that didn't have errors
> out of three years' worth of cash sheets.

(Dalton Depo., RE 26-15, PageID # 1093.)

Lastly, in regard to the $140 overage, Reams argues that this reason is pretext because "there is no evidence remotely supporting that Reams was ever disciplined, or even "counseled" for any of these prior alleged errors." (Appellant Brief, RE 15, PageID # 36.) However, as articulated by the uncontested facts in this case, Reams was repeatedly counseled with regard to her errors. Indeed, Ms. Allen testified to communications being sent to Reams about mistakes and errors that she made, the importance of those errors, and how those errors are not acceptable. (Allen Depo., RE 26-8, PageID # 614-615.) Mr. Dalton testified that he was aware of Reams' errors and directed Mr. LaFaso to counsel Reams on her errors. (Dalton Depo., RE 26-15, PageID # 1081-1082.) And Mr. LaFaso testified that while his counseling did not include formal written warnings, he did have face-to-face conversations with Reams about the errors she committed. (LaFaso Depo., RE 26-13, PageID # 1008.) As it relates to documentation of discipline against Reams for her past errors, Mr. LaFaso testified that the hundreds of pages of documents the Union presented (Reams' Errors (1), RE 26-11, PageID # 727-881; Reams' Errors (2), RE 26-12, PageID # 882-1004) constitutes documentations of discipline against Reams. (LaFaso Depo., RE 26-13, PageID # 1026, 1051-1058.) Indeed, Reams herself admitted these documents constitute documentation of errors in her work performance and, while she wasn't aware of the vast number of documented errors, these documents still

constitute documentation of errors she made as a Clerk. (Reams Depo., RE 26-1, PageID # 377.)

b.    _The Missing $2.57 In Petty Cash_

Turning now to the result of Reams' unsubstantiated explanation for her errors which she claims resulted in $2.57 missing from the Union's petty cash fund, Appellant argues that the missing petty cash did not motivate the Union's decision to terminate Reams because: (1) the Department of Labor ("DOL") never investigated Local 18 regarding the missing petty cash, and (2) Mr. LaFaso testified that he couldn't recall how the petty cash ended up being balanced. (Appellant Brief, RE 15, PageID # 39.) While Reams is correct in her assertions, these alone are insufficient to carry her burden of showing pretext.

To begin, Reams again misstates the facts of this case. Reams claims that the District Court acknowledged that "Reams presented testimony and evidence that Appellee did not investigate the missing $2.57 in petty cash…" (Appellant Brief, RE 15, PageID # 40.) This is false, as the District Court never acknowledged this assertion. Instead, the District Court stated, "Plaintiff argues Defendant overstates the seriousness of the offense, evident by the lack of investigation by the DOL…" (Opinion, RE 30, PageID # 1966.) The District Court was reiterating Reams' argument, not acknowledging that Reams presented **_any_** evidence that Local 18 did

not investigate the missing $2.57. In fact, Local 18 did investigate the missing money, as they called Reams while she was in the hospital and asked about the cash sheet discrepancy and missing funds (Reams Depo., RE 26-1, PageID # 374.) Further, Mr. LaFaso testified that at the meeting on August 19, 2019, Reams was questioned as to the missing petty cash. (LaFaso Depo, RE 26-13, PageID # 1014.) Additionally, on August 20, 2019, Mr. Dalton also questioned Reams as to the missing petty cash. (Dalton Depo., RE 26-15, PageID # 1091.) Thus, it is perfectly clear from the record that Local 18 investigated the missing petty cash.

Second, as the district court corrected noted, "the lack of government enforcement action against [Local 18] or the inability for a single employee (LaFaso) to recall how [Local 18] replenished the petty cash fund does not speak to the seriousness of the infraction or raise a genuine dispute as to whether it is sufficient to warrant dismissal." (Opinion, RE 30, PageID # 1966-1967). Local 18 has provided ample evidence speaking of the seriousness of petty cash discrepancies. Mr. LaFaso testified that missing petty cash is "pretty big deal" and that petty cash must be accounted for "down to the penny". (LaFaso Depo., RE 26-13, PageID # 1017.) Additionally, Mr. Dalton testified that "[c]ash being off in a Labor Union is a major issue with the Department of Labor." (Dalton Depo., RE 26-15, PageID # 1084.) Lastly, Reams herself testified that she was aware the DOL audited Local 18's books, that the DOL can fine or assess civil and/or criminal penalties against the

Union for failing to maintain proper accounting, and that one of the Union's goals in publishing rules and policies as it relates to accounting is to ensure they satisfy the DOL's requirements. (Reams Depo., RE 26-1, PageID # 363.)

Reams has failed to produce any evidence whatsoever that the missing petty cash did not motivate Local 18's decision to terminate Reams' employment. Instead, as stated by the district court, "she simply asks for additional evidence from [Local 18], which has already produced evidence supporting its position." (Opinion, RE 30, PageID # 1967.) Reams' argument ignores that she admits to making an accounting error and was unable to explain where the missing funds went, as she stated in her deposition, "[t]here is no way to account for the $2.57." (Reams Depo., RE 26-1, PageID # 376.) "A plaintiff facing the prospect of summary adjudication cannot sit back and simply poke holes in the moving party's summary judgment motion … but instead, must present material evidence in support of those allegations." *Williams v. Holt,* 2006 WL 2290471, *1 (E.D. Tenn.) (internal citations and quotations omitted). Instead of producing evidence to challenge Local 18's proffered reason, Reams indolently claims that the "district court is attempting to force an impermissible burden on Reams. She is not responsible for disproving every unsupported contention or statement made by the Appellee." (Appellant Brief, RE 15, PageID # 41.) Under the *McDonnell Douglas* burden-shifting framework, however, the burden is on Reams to ***prove by a preponderance of the evidence*** that Local 18's "proffered

reason[s] w[ere] in fact a pretext designed to mask illegal discrimination." *Belasco*

*v. Warrensville Heights City School Dist.,* 634 Fed. Appx. 507, 517 (6th Cir. 2015).

Reams has utterly failed to do so in this case.

c.    *History of Errors*

Local 18's last stated non-discriminatory reason for terminating Reams'

employment is the vast number of clerical errors Reams committed during her few

short years with Local 18. Reams claims that this reason is vulnerable to two pretext

theories, that "at least some" of her past errors have "no basis in fact", and that her

past errors did not actually motivate Reams' termination. (Appellant Brief, RE 15,

PageID # 43.) Reams, however, failed to produce sufficient evidence supporting her

arguments.

The Union presented documentation of no fewer than seventy-two (72)

separate instances between April 28, 2017, and July 16, 2019, where the Union was

alleging that Reams made errors in the dues notification letters Reams sent to Local

18 members. (Reams' Errors (1), RE 26-11, PageID # 727-881; Reams' Errors (2),

RE 26-12, PageID # 882-1004; Reams Depo., RE 26-1, PageID # 371-372.) Out of

the seventy-two (72) instances of alleged errors, Reams was able to point to **four (4)**

which she claims do not represent any errors on her part. (Reams Depo., RE 26-1,

PageID # 368, 370-371.) Even assuming this as true, that still leaves the undisputed

42

fact that Reams admits to making sixty-eight (68) clerical errors to the dues notification letters during her short time as a Clerk. (Id.) Moreover, Reams has failed to address, let alone rebut, her issues and errors as it relates to the cash sheets she submitted to headquarters. Mr. Dalton testified to the frequency of Reams' errors on cash sheets:

> A.     The cash sheets would be, basically, clerical errors. It might be a wrong receipt number, a wrong social security number on a person, the amount is put in the wrong column. Instead of "Dues," it might by under "Assessments," or vice versa. There probably wasn't a week gone by where she didn't have a social security number wrong, wrong receipts. I mean, I reviewed, while she was off, some of her cash sheets from the two or three years prior. There were maybe a handful that didn't have errors out of three years' worth of cash sheets.

(Dalton Depo., RE 26-15, PageID # 1093.) Thus, it is undisputed that there is a basis in fact as to Reams' numerous errors during her time as a Union Clerk.

Reams next claims that Local 18's purported reason for terminating her employment – her past errors – did not actually motivate the Union's decision, the only argument she makes to this point is by stating "(no prior discipline over the past three-plus years)." (Appellant Brief, RE 15, PageID # 43.) This argument is completely belied by the record, as stated above, Reams was advised of the errors she made and counseled on the need to correct them. (*See* Allen Depo., RE 26-8, PageID # 614-615; Dalton Depo., RE 26-15, PageID # 1081-1082; LaFaso Depo., RE 26-13, PageID # 1008, 1026, 1051-1058; Reams Depo., RE 26-1, PageID # 377.)

As to the number of errors Reams committed during her employment, Ms. Roberts testified that Reams "made anywhere between 60 and 75 percent more errors in the short time that she was here that I made in the whole time I was a clerk." (Roberts Depo., RE 26-7, PageID #588.) Reams argues that the District Court's reliance on this statement is misplaced because "Roberts would have absolutely no basis or ability to know, must less quantify the 'number of errors' Reams made … versus when Roberts worked in that position." (Appellant Brief, RE 15, PageID # 43.) Reams seems to have forgotten that Ms. Roberts worked hand-in-hand with Reams during Reams' employment. Indeed, Ms. Roberts testified that she was aware of Reams' mistakes. (Roberts Depo., RE 26-7, PageID # 580.) Ms. Roberts further testified as to specific errors Reams made during Reams' employment:

> A.    There were cases where she had sent letters out to members charging them a wrong amount of money. They would come to the hall and question it. And I would look at everything and say, "Oh, yeah, okay, so this is what you owe." And then I would tell Mr. LaFaso.
> Q.    Did that happen during this period that she was out dealing with the medical issue or was this prior?
> A.    It was constant. So it was when she had her medical issue, but before members would come to the hall to pay and Ms. Reams was either out of the office or at lunch, and I pulled it. She had a file that anybody paying anything, I pulled the memo out or the letter. The person would question, say the agent told me it was, I am just going to throw out a number, $187 and she is charging me $600. Why?

(Id. at PageID # 583.) More to this point, Ms. Roberts testified as follows:

Q.     -- and just generally. Did you have an understanding for the amount and volumes generally, the general amount and volume and frequency of errors that Ms. Reams experienced while she was a clerk? Could you differentiate the volume of your errors that you admit to making versus the volume and number of errors that Ms. Reams is accused of making here?

                         ***

A.     Nowhere near what Ms. Reams made.

Q.     Is that because you were aware, generally, of some of the errors that Ms. Reams made while she was employed here?

A.     Correct.

(Id. at PageID # 588.)

Reams then goes on to state that "Roberts admitted that she made the same types of errors during her employment as a clerk." (Appellant Brief, RE 15, PageID # 43.) Reams argues, "the district court would seemingly hold Reams to the burden of having to 'disprove' this unsupported statement by seeming presenting evidence that she did not commit 65-70 percent more errors than Roberts, as if that was remotely possible to prove one way or the other." (Appellant Brief, RE 15, PageID # 44.) This is an absurd statement. This is exactly what the discovery process is used for. If Reams wanted to propound an argument centered around comparable performances – that Roberts committed the same errors but was not terminated – Reams could have requested Ms. Roberts' employment record, requested evidence of Ms. Robert's alleged errors, or questioned Ms. Roberts about these errors during her deposition. Reams did nothing of the sort, and instead, claims, in effect, that the

45

discovery process is an impermissible burden. It is Reams' burden to prove pretext, and she has utterly failed to do so in this case.

Even though the District Court flatly rejected Reams' first attempt, Reams again attempts to compare this case with that of *Babb v. Maryville Anesthesiologist P.C.*, stating that this case is factually similar to *Babb*. (Appellant Brief, RE 15, PageID # 44.) However, the only fact that is similar between these two cases is that Babb sued her former employer for disability discrimination, the remaining facts surrounding Babb are distinguishable from this case. In *Babb*, the plaintiff was a Certified Registered Nurse Anesthetist ("CRNA") and was diagnosed with a degenerative eye condition. *Babb*, 942 F.3d 308, 311 (6th Cir. 2019). The employer found out about the plaintiff's eye condition, and told plaintiff that "vision issues notwithstanding, she was a 'good fit' and was 'doing well'." *Id*. at 312. The plaintiff then made two (2) clinical errors in the course of her work performance and was ultimately fired with her employer citing those two errors as the reason for her termination. *Id.* at 313. However, following plaintiff's termination an e-mail was sent which stated that "Maryville had fired Babb almost entirely for the other issues discussed during the January 13 meeting, namely, Babb's 'worsening' eyesight." *Id.* at 313-314. Additionally, Babb enhanced her personal testimony, that she did not do anything wrong in terms of the two clinical errors, with an expert report from an experienced CRNA from the local area. *Id.* at 314. This expert opined that the

plaintiff did not violate the standard of care applicable to CRNAs in the area, and that she acted appropriately during both of those two incidents. *Id.* at 314-315.

Unlike *Babb*, Reams has failed to produce similar evidence challenging the veracity of the errors cited by Local 18 as the basis for Reams' termination, nor has Reams introduced sufficient evidence challenging the position that Reams was actually terminated for those errors. Reams argues that this case is similar to *Babb* because Reams "presented evidence questioning each of the alleged infractions against her – including the alleged seriousness of the allegations." (Appellant Brief, RE 15, PageID # 45.) Reams, however, fails to point to this "evidence". The evidence in *Babb* included an email in which the employer stated Babb was fired for her disability. *Babb,* 942 F.3d at 313-314. Reams has failed to produce evidence even remotely similar to the email in *Babb.* Additionally, Babb introduced expert testimony indicating that the alleged "errors" Babb was terminated for, were in fact not errors at all, and Babb's conduct did not violate the standard of care for those in her position. *Id.* at 314-315. On the other hand, Reams clearly admitted to committing each of the errors Local 18 provides as reasons for Reams' termination. Despite Reams' attempt, this case is wholly distinguishable from *Babb.*

Moreover, in analyzing pretext, the Sixth Circuit "has employed a version of the 'honest belief' rule … The formulation used provides that as long as the employer honestly believed the reason it gave for its employment action, an employee is not

able to establish pretext even if the employer's reason is ultimately found to be mistaken." *Ferrari,* 826 F.3d at 895. "[T]o prove that the offered, non-discriminatory basis for the employment action is 'honestly held,' the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Id.* at 896 (internal quotations omitted).

Reams attempts to argue that "Appellee cannot hide behind the honest belief rule." (Appellant Brief, RE 15, PageID # 46.) Reams relies on *Bloomfield v. Whirlpool Corp.,* to support her argument that the honest belief rule should not apply in this case. (Id.) In *Bloomfield,* the United States District Court for the Northern District of Ohio held, "it is not sufficient, however, for Whirlpool to honestly believe the information before it, particularly when the information before it was clearly incomplete." *Bloomfield v. Whirlpool Corp.,* 984 F.Supp.2d 771, 780 (N.D. Ohio 2014). Reams, however, does not attempt to rely on the "incomplete information" holding of *Bloomfield,* and instead makes another attempt at arguing that Local 18's proffered non-discriminatory reasons for terminating Reams did not actually motivated the Union's decision. (Appellant Brief, RE 15, PageID # 48.) As stated above, Reams has failed to produce sufficient evidence to establish pretext under this theory.

Reams' second argument as to why the honest belief rule should apply is exceptionally hollow – that "[Local 18] virtually conducted zero investigation into

these alleged errors." (Appellant Brief, RE 15, PageID # 48.) First, Reams claims that it was she – after being questioned by her employer, thus during the Local 18's *investigation* – who identified the member who overpaid their dues by $100. (Id.) Indeed, as stated above, during the Union's ***investigation*** into the $100 overage, Mr. Cormier denied overpaying, thus the member was never identified. (LaFaso Depo., RE 26-13, PageID # 1014-1015, 1051-1058.) Second, as to the Union's investigation into the missing petty cash, there is ample evidence establishing that Local 18 attempted to track down these missing funds, and it was Reams herself who stated, "[t]here is no way to account for the $2.57." (Reams Depo., RE 26-1, PageID # 376.) Third, Reams admitted that, while she was off work, she received a call from Mr. LaFaso asking about the cash sheet and missing funds. (Id. at PageID # 374.)

It is clear, and corroborated by Reams' own testimony, that Local 18 investigated these errors thoroughly, and it was Reams, after admitted she made these errors, who failed to give an adequate explanation that rectified them. Thus, applying the honest belief rule, Local 18 established its reasonable reliance on the particularized facts of how these errors occurred – Reams failing to properly do her job – and terminated Reams' employment for her errors. There is no disputing that Reams failed to perform the main function of her job as a Union Clerk, accounting. Reams' failure resulted in an overage of Union funds and funds missing from the petty cash. Furthermore, Reams has an extensive history of frequently making errors

on her cash sheets and dues notification letters. Despite Reams' attempt to fashion the facts in a way that best suits her position – by leaving out key facts, misstating the facts, and contradicting her own testimony – Reams failed to produce sufficient, if any, evidence establishing that Local 18's proffered reasons for Reams' termination were pretextual. Thus, Reams has failed to meet her burden of showing pretext. "Conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not enough to defeat a well-supported motion for summary judgment." *Gooden v. City of Memphis Police Dept.,* 67 F. App'x 893, 895 (6th Cir. 2003). Reams' whole case is premised on conclusory allegations, speculations, misstatements of the facts, application of inapplicable law, and unsubstantiated assertions. As such, Reams has failed to produce any evidence supporting her claim that Local 18 terminated her because of her injury. Therefore, Reams' disability discrimination claims fail as a matter of law.

## CONCLUSION

Based on the foregoing, Local 18 respectfully requests that the district court's granting of summary judgment be affirmed as to Counts I and II of the Second Amended Complaint.

Respectfully submitted,

*/s/ Timothy R. Fadel*
TIMOTHY R. FADEL (0077531)

**Fadel & Beyer, LLC**
The Bridge Building
18500 Lake Road, Suite 300
Rocky River, Ohio 44116
Phone: (440) 333-2050
Fax: (440) 333-1695
tfadel@fadelbeyer.com
*Attorney for Defendant-Appellee*
*International Union of Operating*
*Engineers, Local 18*

## CERTIFICATE OF COMPLIANCE

Pursuant to FRAP 32(g), Appellee hereby certifies that its Appellee Brief complies with FRAP 32(a)(7)(B)(i) and contains 12663 words applicable to the word count.

## CERTIFICATE OF SERVICE

Appellee certifies that a copy of the foregoing Appellee Brief was filed electronically via the Court's Online ECF Filing System on July 5, 2023 and made available to all parties, including Appellant.

/s/ Timothy R. Fadel
TIMOTHY R. FADEL (0077531)
**Fadel & Beyer, LLC**

## **ADDENDUM: DESIGNATION OF DOCUMENTS**

1.    RE 1, Complaint, PageID # 1-13.

2.    RE 12, Second Amended Complaint, PageID # 133-146.

3.    RE 26, Defendant's Motion for Summary Judgment and Exhibits 1-20, PageID # 316-1117.

4.    RE 27, Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment and Exhibits 1-7, PageID # 1118-1338.

5.    RE 29, Defendant's Reply Brief in Support of Motion for Summary Judgment and Exhibits 1-12, PageID # 1341-1945.

6.    RE 30, Memorandum Opinion and Order Granting Summary Judgment, PageID # 1946-1970.

7.    RE 31, Judgment Entry, PageID # 1971.

8.    RE 32, Notice of Appeal to the Sixth Circuit Court of Appeals, PageID # 1972.