**Case No. 23-3242**

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT
_____

HEIDI REAMS,

Plaintiff-Appellant,

v.

INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 18

Defendant-Appellee.
_____

On Appeal From The United States District Court for the Northern District of Ohio
Case No. 3:21-cv-878, Judge James R. Knepp II

---

**REPLY BRIEF FOR APPELLANT HEIDI REAMS**

---

*/s/ Fred M. Bean*
Fred M. Bean (0086756)
**THE SPITZ LAW FIRM, LLC**
25825 Science Park Drive, Ste., 200
Beachwood, OH  44122
Phone:   (216) 291-4744
Fax:        (216) 291-5744
Email: fred.bean@spitzlawfirm.com

*Attorney for Appellant Heidi Reams*

# **TABLE OF CONTENTS**

**TABLE OF AUTHORITIES** ...........................................................................iii

**ARGUMENT** .............................................................................................. 1

**I.    REGARDLESS OF THE PRIMA FACIE CASE FRAMEWORK, REAMS HAS ESTABLISHED A QUESTION OF FACT THAT SHE WAS DISABLED** .............................................................. 1

**II.   REAMS DID PRODUCE EVIDENCE OF PRETEXT AND THE DISTRICT COURT ERRED BY WEIGHING THAT EVIDENCE IN FAVOR OF APPELLEE** ............................................................ 4

**A. Predictably, Appellee Asserts That Reams Made Numerous Errors During Her Employment, Despite Irrefutable Evidence That These Alleged Errors Never Once Motivated Appellee To Even Discipline Reams, Let Alone Terminate Her** ................................. 4

**B. Reams Has Set Forth Pretext Evidence Regarding The Final Allegations Made Against Her After Appellee Learned About Her Disability And Hospitalization** .............................................. 9

**CONCLUSION** .......................................................................................... 17

**CERTIFICATE OF COMPLIANCE** ...................................................... 18

**CERTIFICATE OF SERVICE** ................................................................ 18

**ADDENDUM: DESIGNATION OF DOCUMENTS** ............................. 19

# TABLE OF AUTHORITIES

## CASES

*A.C. ex rel. J.C. v. Shelby County Bd. of Educ.*, 711 F.3d 687 (6th Cir. 2013) ................................................................................13(fn. 1)

*Dews v. A.B. Dick Co.*, 231 F.3d 1016 (6th Cir. 2000)................................4

*Hood v. Diamond Products, Inc.*, 74 Ohio St.3d 298, 1996 Ohio 259, 658 N.E.2d 738................................................................................................ 1

*Leary v. Fed. Express Corp.*, 2022 WL 19039658 (6th Cir.) ......................... 1

*Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078 (6th Cir. 1994) ................4

*McGriff v. Beavercreek City School District*, 2021 WL 2401921 (S.D. Ohio) ......................................................................................................3

*Morrissey v. Laurel Health Care Co.*, 946 F.3d 292 (6th Cir. 2019)......................3

*Mullins v. Cyranek*, 2014 WL 3573498 (S.D. Ohio)....................................13(fn. 1)

*Singfield v. Akron Metro. Hous. Authority*, 389 F.3d 555 (6th Cir. 2004) ...........4, 17

*Trout v. FirstEnergy Generation Corp.*, 339 F. App'x 560 (6th Cir. 2009) ....................................................................................13(fn. 1)

*Tuttle v. Tyco Elecs. Installation Servs., Inc.*, 2008 WL 343178 (S.D. Ohio) ..................................................................................13(fn. 1)

## STATUTES AND REGULATIONS

29 C.F.R. § 1630.2 ............................................................................. 2-3

42 U.S.C. § 12101, *et seq.*............................................................................3

## <u>ARGUMENT</u>

### I.   <u>REGARDLESS OF THE PRIMA FACIE CASE FRAMEWORK, REAMS HAS ESTABLISHED A QUESTION OF FACT THAT SHE WAS DISABLED.</u>

In its Brief, Appellee begins by asserting that Reams applied the wrong prima facie case formula to her claims, however, in the same breath, admits that it, nevertheless, is only challenging a single element of the prima facie case – whether Reams was disabled. Specifically, Appellee states, "Reams is correct in her assertion that Local 18 disputes only the first element, that Reams is considered disabled under the ADA." Doc. 18, Appellee's Brief, Page 31. As this element is shared by both the *Hood* and *Leary* standards cited in Appellee's Brief, the distinction between the prima facie case formula is irrelevant.

Even so, Appellee then shifts gears and seemingly attempts to argue that "the Union was not made aware of any disability Reams was suffering from" when she attempted to return to work on August 19, 2019. However, this statement runs afoul of the facts because Appellee (through several witnesses) admitted to knowledge of Reams' disability – in fact, well before her return to work. Indeed, Brett LaFaso learned about Reams' condition on or around July 28, 2019, including that she was in the hospital and had "torn a blood vessel or artery." LaFaso Deposition, RE 29-8, PageID #1780. Moreover, Richard Dalton learned that same weekend about Reams' condition after getting a call from LaFaso who informed him that Reams was in the

hospital from an incident with a "chiropractor" that "caused her to black out" after a "neck snap" procedure. Dalton Deposition, RE 27-3, PageID #1216. Finally, on August 5, 2019, upon being discharged from the hospital, Reams presented a letter from her physician, Dr. Pillai, to Kathy Allen, updating her about her medical status. Reams Declaration, RE 27-1, PageID #1160; Allen Deposition @ Exhibit 1, RE 27-5, PageID #1286. The letter indicated in part that Reams had previously been admitted for a "right artery dissection with 70% obstruction." Allen Deposition @ Exhibit 1, RE 27-5, PageID #1286. Thus, any attempt at arguing that Appellee was "unaware" of Reams' disability is contradicted by the record.

Next, Appellee argues that Reams' condition should not be considered a disability because she testified that her condition "did not prevent her from doing any part of her job as a Clerk." Doc 18, Appellee's Brief, Page 34. However, millions of Americans work with disabilities, with and without accommodation, so surely Appellee is not attempting to argue that because Reams was able to perform her duties as Clerk, that meant she was not disabled. Indeed, the in same sentence, Appellee admits that Reams "suffered from a partially blocked artery that could cause a stroke at any minute." Doc 18, Appellee's Brief, Page 34. This acknowledgement, coupled with the broad scope of the ADAAA's regulations, establishes a genuine issue of material fact that Reams was disabled. Again, 29 C.F.R. § 1630.2(j) states in relevant part:

> (i) The term "substantially limits" **shall be construed broadly in favor of expansive coverage**, to the maximum extent permitted by the terms

of the ADA. "Substantially limits" is not meant to be a demanding standard.

(**Emphasis** added).

Moreover, Appellee wholly ignores that fact that Reams was receiving treatment, as well as using medication (Coumadin) to help control her disability and minimize the likelihood of "having a stroke," factors which cannot be used against her in determining whether she is disabled. *See* 42 U.S.C. § 12102(4)(E)(i)(I). Furthermore, Appellee does not attempt to contest the major life activities that would be substantially limited by Reams' disability, especially if she suffered a stroke or other serious reaction from her torn artery. *See* 29 C.F.R. § 1630.2(i)(1)(ii); *See* Doc 15, Appellant Brief, Page 29.

Finally, Appellee makes no attempt to argue or dispute the law that Reams' own testimony, without more, is sufficient to raise a genuine issue of material fact regarding her disability. *See McGriff v. Beavercreek City School District*, 2021 WL 2401921 (S.D. Ohio); *Morrissey v. Laurel Health Care Co.*, 946 F.3d 292, 300 (6th Cir. 2019); 29 C.F.R. § 1630.2(j)(1)(iii) and (v). Thus, based on the record and law before this Court, Reams has demonstrated that a genuine issue of material fact remains as to the first element of her prima facie case, and Appellee does not contest any other element of that test.

## II.   REAMS DID PRODUCE EVIDENCE OF PRETEXT AND THE DISTRICT COURT ERRED BY WEIGHING THAT EVIDENCE IN FAVOR OF APPELLEE.

### A. Predictably, Appellee Asserts That Reams Made Numerous Errors During Her Employment, Despite Irrefutable Evidence That These Alleged Errors Never Once Motivated Appellee To Even Discipline Reams, Let Alone Terminate Her.

Reams can refute the legitimate, nondiscriminatory reason articulated by Appellee "by showing that the proffered reason (1) has no basis in fact, (2) **did not actually motivate the Appellee's challenged conduct**, or (3) was insufficient to warrant the challenged conduct." *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000). (**Emphasis** added). A plaintiff using the second pretext option "admits the factual basis underlying the employer's proffered explanation and further admits that such conduct could motivate dismissal," but "**attempts to indict the credibility** of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was more likely than that offered by the Appellee." *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1081, 1084 (6th Cir. 1994). Moreover, the Sixth Circuit has cautioned that "in discrimination and retaliation cases, an employer's true motivations are particularly difficult to ascertain" and therefore specific allegations or evidence by the plaintiff are not necessary in order to create a genuine issue of material fact. *Singfield v. Akron Metro. Hous. Authority*, 389 F.3d 555 (6th Cir. 2004).

Appellee first attempts to support Reams' termination by citing her "history of errors." As pointed out in its Brief, no doubt since this Reams brought this

litigation, Appellee has labeled her as a poor performing employee (basically from the very beginning), one that was a "terrible" typist and whose "emails were bad." Doc 18, Appellee's Brief, Page 36. Indeed, Appellee's witnesses unsurprisingly have gone out of their way to emphasize just how bad of an employee Reams was during her employment, to the point where she was seemingly underperforming her job on a daily basis. To be frank, Appellee's witnesses paint of a picture of Reams as an employee that probably should have been terminated within the first few weeks of her employment. This has been the *post-litigation* testimony offered by Appellee. However, the Court must examine the *pre-litigation* evidence in this case, specifically, the evidence that existed **during** Reams' employment, which paints a much different picture of her as an employee. When doing so, the Court must ask does the evidence "indict the credibility" of Appellee's position that Reams was seemingly this awful employee who was "terrible" and "bad" at various aspects of her job.

Initially on its very face, this is an odd argument for Appellee—namely, that it was somehow motivated to terminate Reams in August 2019 for the asserted reason that she made "no fewer than seventy-two separate [errors] between April 28, 2017 and July 16, 2019." Doc 18, Appellee's Brief, Page 50. This is akin to a plaintiff trying to assert a causal connection for a retaliation claim by arguing that she complained about discrimination in 2017 and then was fired because of that

complaint over two years later in 2019. Surely, this Court would likely put no stock in the temporal connection between those events given the passage of time. The same reasoning applies to Appellee's position, and thus, reliance upon it only strengthens the case *against* summary judgment.

Indeed, here is what the evidence shows. First, Reams was not employed with Appellee for a few weeks or months, but instead, over **three years**. Over that same period of time, the evidence is undisputed that she was **never** disciplined in *any* format for any real or perceived performance issue. Indeed, Allen, who had the power to issue employee discipline, including written warnings, never disciplined or even sought to discipline Reams for any reason during her employment. Allen Deposition, RE 26-8, PageID #604, 610. Similarly, LaFaso, who directly supervised Reams for her entire employment, admitted to never disciplining Reams for any reason, including any alleged performance issues. LaFaso Deposition, RE 29-8, PageID #1797, 1799. Finally, LaFaso's supervisor, Dalton, who served as Appellee's Business Manager at the time, similarly was not aware of one documented instance of Reams ever being disciplined during her employment. Dalton Deposition, RE 27-3, PageID #1211, 1213.

Moreover, there are serious credibility concerns with the *alleged* errors Appellee claims Reams committed during her employment. While Appellee threw together a stack of documents and put it in front of Reams at her deposition, Reams responded by

pointing out that several of those documents were not even errors at all, let alone clerical errors common to her job as a Clerk.

As to the latter, errors on documents for member dues and cash sheets was so common that Appellee employed a group of people at its headquarters to specifically review this documentation and communicate any errors to the Clerks so that they could be corrected. Indeed, Roberts testified that she made numerous accounting errors during her career as the Clerk, prior to becoming the dispatcher:

> Q. Ms. Roberts, in your ten years, or so, I know we were estimating that you were a clerk for District 2, did you ever make any errors?
>
> A. Yes.
>
> Q. Did you ever have situations were corporate in Cleveland, or whether it was someplace else, ever came back to you and reported to you that there were errors that were submitted that they caught?
>
> A. Yes.
>
> Q. And you had to fix them?
>
> A. Yes.
>
> Q. And were there other errors that you made that were caught at the district level where the district rep said, "Hey, this is wrong, fix this, please?"
>
> A. Yes.
>
>            * * *
>
> Q. And if it was a situation where you did make an error on a letter, or whatever it was, or on a cash sheet, or whatever, and corporate caught it and came back to you, they talked to you and you fixed it, right?
>
> A. Correct.
>
> Q. And then you never heard about it again after that?

7

> A.  Correct.

RE 29-10, Roberts Deposition, PageID# 1855.

If such errors did occur, Allen testified that there was a simple process in place to have them corrected:

> Q.  So if there was an error, it would be caught very week assuming it was being reviewed accurately, correct?
>
> A.  Yes.
>
> Q.  And if there was an error, you would bring it to the attention of the person at the district office of what the error was?
>
> A.  Correct.

RE 29-6, Allen Deposition, PageID# 1712.

As to the former, Reams specifically addressed the credibility of Appellee's stack of "alleged errors" by pointing out that several of instances involved situations where a member would come back into the office, *after the fact*, and pay extra dues or a different amount than owed, which would then require new or amended paperwork by the Clerk. Reams testified to this during her deposition:

> A.  As I said before, this was standard practice. When I would get extra dues, I would mark what they would be paid through and the total amount I charged at that time of initiation.

RE 29-1, Reams Deposition, PageID# 1378; RE 27-1, Reams Declaration, PageID# 1158.

As explained in the Appellant Brief, the district court was led astray by Appellee's general statements that had no offered support behind them, including the statement from Roberts that Reams "made anywhere between 60 and 75 percent more

8

errors in the short time that she was here…" Roberts Deposition, RE 26-7, PageID #588. The district court neglected to quote Roberts' additional testimony that even if these errors did happen, they were not of concern enough to ever discipline Reams:

> Q. And despite all those errors, Ms. Roberts, you worked with Heidi Reams for over three years, correct?
>
> A. Correct.
>
> Q. And at no time in discovering or witnessing these numerous unbelievable amount of errors did you ever express to Ms. LaFaso or anyone else that Ms. Reams should be replaced or that she was unfit to do her job, correct?
>
> A. No.

RE 29-10, Roberts Deposition, PageID# 1856.

Again, it is not Reams' burden, especially at the summary judgment stage, to disprove whether she ever made any clerical errors during her employment; instead, her burden is simply to create a genuine issue of material fact whether it is credible to believe that these errors actually motivated Appellee to discipline or terminate Reams' employment. Reams has done so.

### B. Reams Has Set Forth Pretext Evidence Regarding The Final Allegations Made Against Her After Appellee Learned About Her Disability And Hospitalization.

Next, Appellee turns it attention to the final allegations made against Reams that directly preceding her termination. Specifically, on Monday, July 29, 2019, **the day after** Appellee's representatives learned about Reams' condition and hospital admission, Roberts reported to LaFaso that there were "errors" in Reams'

documentation, related to an overage in cash. Roberts Deposition, RE 26-7, PageID #581-582. So before going any further, the Court is armed with the following facts: (1) Reams allegedly made "hundreds" of errors between April 2016 and July 28, 2019 – none of which ever led to so much as a warning in her file, let alone talk of termination; and (2) the day after Appellee learned about her disability and hospitalization, it likewise learned of a new "error" allegation, and then moved straight to terminating Reams on her second day back from her medical leave.

### $140 Overage

Appellee first mentions the $140 overage, an issue that Reams herself first brought to Roberts' attention before she left for her chiropractor appointment because the two of them needed to work through the issue and balance the cash sheet, as they had done throughout her three-plus years of employment. Appellee starts by admitting that Roberts' falsely testified that the overage in question was "$300" but then attempts to explain that away by saying time had passed between the event and her deposition. Respectfully, inconsistent deposition testimony is a jury issue, not one to be resolved by Roberts' attorney.

Next, Appellee tries to call into the question whether $40 of the alleged $140 overage was simply money placed in the wrong bag (dues v. petty cash). Appellee says this is mere supposition by Reams, however, the information is plainly located in Michael Bertolone's email from August 19, 2019 following his interview with

Reams. Allen Deposition, RE 27-5, PageID #1287-1288 @ Exhibit 3. At no point does Bertolone contest Reams' position regarding the $40, nor has Appellee offered any counter-evidence suggesting that her explanation was false. So, the issue is not "supposition" by Reams—she was interviewed by Bertolone regarding the funds, and she explained where that $40 came from as part of the alleged overage.

Next, Appellee addresses Reams' encounter with Micha Cormier, whereby he overpaid $100 in his dues, and states in part that "Reams conceded that she did not even count the money the member gave her." Doc 18, Appellee's Brief, Page 41. For one, Reams testified during her deposition that when this encounter with Cormier happened, "as [she] was counting he went to the truck because he thought he was short." RE 29-1, Reams Deposition, PageID #1384. Moreover, Appellee attempts to dress this up as a *serious* error that was akin to "stealing from a member," however, again, Appellee's credibility is indicted by the fact that it never even took any steps to investigate the $100 overage, let alone return that alleged overage. Indeed, Dalton testified that the "Department of Labor will come down all over us for money being off." RE 29-7, Dalton Deposition, PageID# 1757. However, in the same line of questioning, Dalton then admitted, both that the $100 was never repaid to any member, and two, that the Department of Labor never even questioned Appellee about this issue:

> Q. Was there any resolution to that or was—I mean, was $100 paid back to a union member at any point, or what happened?

A. No, at that point when nobody came forward and we couldn't determine who it was, I instructed them to send a memo to put the $100 into the Christmas basket fund for the membership for that district.

\* \* \*

Q. You had mentioned earlier today about these issues dealing with cash, and, you know, the DOL regulating that or monitoring that on your guys' side, correct?

A. Yes.

Q. So as it relates to these issues that we just discussed with Heidi Reams, whether it was the 100 bucks or the petty cash or the PEP or any of that, did you end up having any issues with the DOL regarding any of these issues?

A. No.

Q. Were you subjected to any type of audit or review regarding any of those issues dealing with Ms. Reams?

A. No.

Q. Any penalties from the DOL or any other regulatory agency related to these issues?

A. No.

RE 29-7, Dalton Deposition, PageID# 1759-1760.

To make matters worse, Appellee then cites to LaFaso's deposition testimony regarding the Cormier incident, but in doing so, cites to LaFaso's **new** testimony from his errata sheet whereby LaFaso *completely changes* his sworn testimony. For comparison purposes, here are the answers in question:

Q. And what was determined was that there was one issue with, potentially, a member who overpaid on dues by about $100, right?

A. That is correct.

12

RE 26-13, LaFaso Deposition, PageID# 1014.

Thereafter, LaFaso completely changed his answer to this question in his

errata sheet:

> Q. And what was determined was that there was one issue with,
> potentially, a member who overpaid on dues by about $100, right?
>
> A. That is correct. Ms. Reams claimed that the extra $100.00 could be
> the result of a member named Micah Cormier overpaying. But we
> checked with Mr. Cormier and he said he did not overpay and was not
> missing $100.00.

RE 26-13, LaFaso Deposition, PageID# 1053.

Aside from addressing the open and obvious abuse of using an errata sheet to

substantively change a deponent's sworn testimony,[1] even LaFaso's new testimony

in his errata sheet does not dispel the question of fact whether Cormier was the

member who erroneously overpaid his dues to Reams.

---

[1] "Rule 30(e) does not allow one to alter what was said under oath." *Trout v.
FirstEnergy Generation Corp.*, 339 F. App'x 560, 565 (6th Cir. 2009) (quoting
*Tuttle v. Tyco Elecs. Installation Servs., Inc*., 2008 WL 343178, at *4 (S.D. Ohio
Feb. 7, 2008)). "If that were the case, one could merely answer the questions with
no thought at all[ ], then return home and plan artful responses ... A deposition is not
a take home examination." *Id*. (quoting *Tuttle*, 2008 WL 343178, at *4). Pursuant to
*Trout*, courts in the Sixth Circuit have "disregarded errata sheets when they attempt
to make more significant alternations, even for the purpose of clarifying." *See e.g.
Mullins v. Cyranek*, 2014 WL 3573498, at *2 (S.D. Ohio July 21, 2014). The Sixth
Circuit has reemphasized this point as it relates to summary judgment, stating that it
is "clear" that a party cannot eliminate a genuine issue of material fact by using an
errata sheet to "counteract the effect of previous deposition testimony." *A.C. ex rel.
J.C. v. Shelby County Bd. of Educ*., 711 F.3d 687, 702-03 (6th Cir. 2013).

13

In its Brief, Appellee then quotes two additional responses from LaFaso that not only substantively changed, but done in a way to complete change the answer altogether from LaFaso's "I don't recall" responses during his deposition, to him suddenly recalling a different response for purposes of the errata sheet. *See* Doc 18, Appellee's Brief, Page 43 *compared with* RE 26-13, LaFaso Deposition, PageID #1015.

Next, Appellee argues that the incident with Cormier "was not the same type of error" Reams had experienced in the past with union dues being overpaid by members. However, for one, Appellee offers zero evidence to support this assertion and cites to no evidence in the record. Two, it is a false statement, because this was *exactly* the type of discrepancy that both Reams and Roberts encountered on cash sheets, which is why they were to work together at the end of every week to balance the sheet. Roberts described this process as it related to her and Reams:

> Q. So one of Ms. Reams' responsibilities was to compile or keep track of cash sheets on a weekly basis?
>
> A. Correct.
>
> Q. Did you have any responsibilities tied to those cash sheets, as a dispatcher?
>
> A. She would count the money, and then I would count the money, and we would both sign off on the receipt.
>
>             * * *
>
> Q. So when would you and Ms. Reams do this exercise? Was this every day?

14

A.  Yes.

RE 29-10, Roberts Deposition, PageID# 1843.

Moreover, according to Roberts, this dual-check exercise was also used to catch

any errors or discrepancies that showed up on the cash sheet:

> Q.  And what would happen if at any part in that process [Ms. Reams] counted the money or you counted the money or you guys were going through the receipts and it didn't match something on the cash sheet. What would happen then?
>
> A.  She would have to take the receipts, look at every entry in the cash sheet and find the error.
>
> Q.  And then correct it on the cash sheet, itself?
>
> A.  Correct.

RE 29-10, Roberts Deposition, PageID# 1844.

Here, the $100 overage related to Cormier was no different than any cash sheet

discrepancy in that the cash sheet was off by $100 and Reams and Roberts had to

figure out why that was the case. This likely would have happened between them on

July 26, 2019, per usual, but for Reams having to leave early for her chiropractor

appointment, which she never returned from the following week. Appellee is

attempting to isolate this incident and make it into something different, likely for

one reason—because Appellee knows that its failure to care or counsel Reams for

these very same type of alleged errors over the prior three-year period does not

support its defense in this case.

**$2.57 In Petty Cash**

As to the remaining issue[2] of whether Reams could account for $2.57 of petty cash, Appellee begins by admitting that Reams presented evidence that (1) the DOL never investigated or even called Appellee about this alleged discrepancy despite Dalton's testimony that the DOL would "come down all over us" if any such infraction were to occur, and (2) that LaFaso could not account for how the alleged missing $2.57 in petty cash was even rectified, if at all.

Next, Appellee states, "Local 18 did investigate the missing money, as they called Reams **while she was in the hospital**…" Doc 18, Appellee's Brief, Page 48. So, Appellee's admitted idea of an investigation was that they called Reams while she was being hospitalized for a torn carotid artery to ask her general questions about alleged missing funds. Appellee does not contend that it conducted *any* investigation into this issue beyond this single call to Reams in the hospital.

Next, Appellee states that "it provided ample evidence speaking of the seriousness of petty cash discrepancies." Doc 18, Appellee's Brief, Page 48. Appellee's idea of such "evidence" – LaFaso making a general statement during his deposition that petty case is "a pretty big deal." *Id.* Moreover, Appellee then contradicts itself by pointing to LaFaso's testimony that petty cash "must be

---

[2] Originally, Appellee tried to blame Reams for a third infraction regarding PEP inventory (an extra sweatshirt), but it was proven that this allegation was improperly raised against Reams and was unsubstantiated.

16

accounted for 'down to the penny'," which is demonstratively false here because nothing was ever done about the $2.57 allegedly missing in this case. In truth, Appellee provide no evidence "speaking to the seriousness of petty cash discrepancies." No documents, no examples of prior discrepancies where penalties were levied, nothing. Appellee cannot simply throw speculative and conclusory statements at the wall as a means to achieve summary judgment.

Finally, Appellee caps its argument by misquoting the law and wrongfully asserting that Reams has the burden "to prove by a preponderance of the evidence" that Appellee's proffered reason for terminating her was a pretext for discrimination. This is precisely the point that both Appellee and the district court fumbled—Reams is under no such burden *at the summary judgment stage*. Rather, she merely needs to raise a genuine issue of material fact that would then allow a jury to conclude at trial that Reams has proven her case by a preponderance. Based on this standard, this Court previously held in *Singfield* that cases involving these types of factual determinations are frequently inappropriate for summary judgment. 389 F.3d 555. The Court should apply the same caution herein, and reverse the decision to grant summary judgment.

## **CONCLUSION**

Based on the foregoing reasons, as well as those set forth in her Appellant Brief, Reams respectfully requests that the district court's granting of summary

judgment be reversed as to Counts I and II of the Second Amended Complaint. Reams further requests that her case be remanded for jury trial.

Respectfully submitted,

*/s/ Fred M. Bean*
Fred M. Bean (0086756)
**THE SPITZ LAW FIRM, LLC**
25825 Science Park Drive, Suite 200
Beachwood, OH  44122
Phone:    (216) 291-4744
Fax:        (216) 291-5744
Email: fred.bean@spitzlawfirm.com

*Attorney for Appellant Heidi Reams*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to FRAP 32(g), Appellant hereby certifies that her Reply Brief complies with FRAP 32(a)(7)(B)(ii) and contains 4,266 words applicable to the word count.

## **CERTIFICATE OF SERVICE**

Appellant certifies that a copy of the foregoing Reply Brief was filed electronically via the Court's Online ECF Filing System on July 24, 2023 and made available to all parties, including Appellee.

*/s/ Fred M. Bean*
Fred M. Bean (0086756)
**THE SPITZ LAW FIRM, LLC**

18

## <u>ADDENDUM: DESIGNATION OF DOCUMENTS</u>

1. Document 15, Appellant's Brief, Page 1-51.

2. Document 18, Appellee's Brief, Page 1-60.

3. RE 12, Second Amended Complaint, PageID #133-146.

4. RE 26, Defendant's Motion for Summary Judgment and Exhibits 1-20, PageID #316-1117.

5. RE 27, Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment and Exhibits 1-7, PageID #1118-1338.

6. RE 29, Defendant's Reply Brief in Support of Motion for Summary Judgment and Exhibits 1-12, PageID #1341-1945.

7. RE 30, Memorandum Opinion and Order Granting Summary Judgment, PageID #1946-1970.